## SMELTZER v. ST. LOUIS & S. F. R. CO.

(Circuit Court, W. D. Arkansas, Ft. Smith Division. February 29, 1908.)

**1. COMMERCE—REGULATION OF INTERSTATE COMMERCE—POWER OF CONGRESS.**

The power of Congress under the interstate commerce clause of the Constitution is plenary, and without limitations other than those prescribed in the Constitution itself.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Commerce, § 3.]

**2. STATUTES—CONSTITUTIONALITY—BURDEN OF PROOF.**

The burden of proof is upon those who affirm the unconstitutionality of an act of Congress to show clearly that it is in violation of the Constitution; it is not sufficient to merely raise a doubt.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 46.]

**3. CONSTITUTIONAL LAW—INTERSTATE COMMERCE ACT.**

The provision of section 20 of the Interstate Commerce Act of Feb. 4, 1887, c. 104, 24 Stat. 386 [U. S. Comp. St. 1901, p. 3169], as amended by the Hepburn Act of June 29, 1906, c. 3591, § 7, 34 Stat. 593 [U. S. Comp. St. Supp. 1907, p. 909], which makes a common carrier receiving property for transportation from a point in one state to a point in another liable for all loss or damage to such property whether it occurred on its own line or on connecting lines, and provides that no contract, receipt, rule, or regulation shall exempt it from such liability, is not unconstitutional as interfering with the liberty of contract, or as depriving the carrier of its property without due process of law, but is within the power of Congress under the commerce clause of the Constitution.

**4. SAME—COMMON-LAW LIABILITY—CONTRACT FOR THROUGH CARRIAGE.**

Under the common law, independently of statute, where a common carrier receives property for carriage beyond its own line, issuing a through bill of lading therefor, specifying the freight for through carriage, it makes its connecting carriers its agents, and is responsible to the shipper for any loss or damage to such property either on its own or the connecting lines, which liability it cannot limit by contract.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, § 817.

At Law. On motion to strike out paragraph of complaint.

Sam R. Chew, for plaintiff.

B. R. Davidson, for defendant.

ROGERS, District Judge. This is a motion to strike out the following paragraph of the complaint:

"And as such corporation and common carrier it became and is liable for all damages done or caused to be done to freight or property it received for transportation over its said line of railroad to points beyond and off its said line of railroad, whether such damages occurred on or off the said line of railroad."

The language quoted is based on the last two paragraphs of section 7, of what is known as the "Hepburn Act," passed June 29, 1906, c. 3591, 34 Stat. 595 [U. S. Comp. St. Supp. 1907, p. 909], which provide:

"That any common carrier, railroad or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.

"That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

The purpose of the suit is to hold the St. Louis & San Francisco Railroad Company, as the initial carrier, for losses sustained beyond the terminus of its line, upon a bill of lading which contained a provision distinctly limiting the liability of the initial carrier for losses which occurred on its own line. Clearly the paragraph should not be struck out if the first paragraph of section 7 of the Hepburn act quoted, supra, is constitutional; for, in that event, the provision in the bill of lading limiting the defendants' liability to losses sustained on its own line must be disregarded, because against public policy; it being in conflict with the statute. Calderon v. Atlas Steamship Co., 170 U. S. 272–277, 18 Sup. Ct. 588, 42 L. Ed. 1033; The Southwark, 191 U. S. 1–17, 24 Sup. Ct. 1, 48 L. Ed. 65; McMullen v. Hoffman, 174 U. S. 648, 19 Sup. Ct. 839, 43 L. Ed. 1117.

The question is thus clearly presented whether the Congress had the power under the interstate commerce clause of the Constitution to enact the statute quoted. No tribunal can approach the consideration of that question without a full sense of its importance, both to the people and the railroads. If upheld, the limits of its far-reaching effects are scarcely to be comprehended in advance, and, of necessity, must result in a reconstruction of the methods employed in the conduct of the stupendous volume of commerce it

so radically affects. It is a matter of public history, and was admitted by counsel for the defendant at the argument, that abuses have for years been practiced by those in the control and management of the great transportation business of the country. The Congress, recognizing the oppressive conditions resulting from such abuses, determined upon a course of remedial legislation, and began tentatively, step by step, to exercise its constitutional power of regulation. The questions which have grown out of this legislation were new, complex, intricate, and difficult, always bordering close by the line of constitutional power, and the decisions of the great court of last resort upon these questions have been, if not obscure, exceedingly perplexing and difficult to reconcile with each other, and the judges themselves, oftener than otherwise, have been almost equally divided upon them, and not unfrequently those concurring or dissenting have reached their conclusions upon distinctly different lines of reasoning. This was, perhaps, to be expected. As far back as Gibbons v. Ogden, 9 Wheat. 1, 236, 6 L. Ed. 23, Mr. Justice Johnson, in his separate opinion, said that:

"It would be in vain to deny the possibility of the clashing and collision between the measures of the two governments. The line cannot be drawn with sufficient distinctness between the municipal power of the one and the commercial powers of the other. In some points they meet and blend so as scarcely to admit of separation. Hitherto the only remedy has been applied which the case admits; that of a frank and candid co-operation for the general good."

Confronted by these perplexing conditions, the question stated, involving, indirectly, at least, immense interests, has been met with that deep sense of responsibility it deserves, and has not been disposed of until it has been carefully and patiently considered. Before entering upon the consideration of the question, it is perhaps well to say that no evil results that might follow from the enforcement of any legislative act are, in any sense, a test of its constitutionality. They involve questions of expediency only, which may be properly addressed to the legislative body which enacted the statute, but are to be disregarded by the courts unless they involve the power of such body to pass the act.

The grant of the commerce power found in the Constitution is couched in these words:

"Congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

The power to enact the statute under consideration must be found, if it exists, in that language. What is the "power to regulate commerce among the several states"? Chief Justice Marshall, in Gibbons v. Ogden, 9 Wheat. 196, 6 L. Ed. 23, answered the question, and the answer has always been acquiesced in by the courts to this day. He said:

"It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution. * * * If, as has always been understood, the sovereignty of Congress, though limited to specific objects, is plenary as to those objects, the power over commerce with

foreign nations, and among the several states, is vested in Congress as absolutely as it would be in a single government, having in its Constitution the same restrictions on the exercise of power as are found in the Constitution of the United States."

This definition was accepted by that great court in a very recent case of the utmost importance. Howard v. Illinois Central Railroad Company et al., known as the "Employer's Liability Decision" (not yet officially reported) 28 Sup. Ct. 141, 52 L. Ed. ——. It is thus seen that there are no limitations to this commerce power except such as are found in the Constitution itself. To illustrate: This power to regulate commerce cannot be exercised so as to deprive one of his property without due process of law, because that would violate the fifth amendment to the Constitution, which provides, among other things, that no person shall be "deprived of life, liberty, or property without due process of law." Again, it cannot be exercised so as to invade the reserved powers of the state, because that would violate article 10 of the Constitution, which provides that:

"The powers not delegated to the United States by the Constitution, nor inhibited by it to the states, are reserved to the states respectively, or the people."

The recent decision upon the employer's liability act (Act July 11, 1906, c. 3073, 34 Stat. 232 [U. S. Comp. St. Supp. p. 891]), Howard v. Illinois Central R. R. Co., supra, is an illustration of this. There, in legislating under the commerce power, Congress invaded the municipal powers reserved to the states; and hence the act was unconstitutional. Numerous other illustrations might be suggested, but they must find their origin always in the Constitution, and nowhere else.

In considering this statute it must be kept in mind that the rule is settled by a long and unbroken line of decisions, commencing shortly after the adoption of the Constitution, and always consistently followed, that no statute shall be declared unconstitutional except in a clear case; that every possible presumption is in favor of its validity; that if a statute is susceptible of two constructions, one of which brings it within, and the other forces it beyond, the constitutional power of Congress, the former should be adopted; and that the burden of proof is upon those who affirm the unconstitutionality of an act of Congress to show clearly that it is in violation of the Constitution. It is not sufficient for them to merely raise a doubt. Hylton v. U. S., 3 Dall. 175, 1 L. Ed. 556; Legal Tender Cases, 12 Wall. 531, 20 L. Ed. 287; The Trade-Mark Cases, 100 U. S. 96, 25 L. Ed. 550; Nicol v. Ames, 173 U. S. 514, 19 Sup. Ct. 522, 43 L. Ed. 786; Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525; The Sinking Fund Cases, 99 U. S. 718, 25 L. Ed. 496; U. S. v. Coombs, 12 Pet. 76, 9 L. Ed. 1004. In Interstate, etc., R. R. v. Mass. (decided November 4, 1907, and not yet officially reported) 28 Sup. Ct. 26, 52 L. Ed. ——, the court said:

"It is not enough that the statute goes to the verge of constitutional power. We must be able to see clearly that it goes beyond that power. In case of real doubt a law must be sustained."

Moreover, the rule must always be borne in mind that by the very letter of the Constitution "Congress may make all laws which shall be necessary and proper for carrying into execution" these granted powers. The commerce power is one that is expressly granted, and Congress therefore has constitutional authority expressly conferred to make all laws necessary and proper for carrying it into execution. Mr. Chief Justice Marshall said, in McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, that:

"If the act be legitimate and within the scope of the Constitution, all means which are appropriate and which are, consequently, adapted to the end, which are not prohibited, may constitutionally be employed to carry it into effect."

It is important to note, also, that while decisions relating to the constitutionality of state statutes may throw much light on the subject now to be considered, nevertheless they do not determine the limitations of the commerce power under the Constitution. On the contrary, many state statutes are held unconstitutional for the very and sole reason that they conflict with the commerce power under the Constitution.

Let us first examine critically the bill of lading sued on. For convenience these bills of lading are printed with blanks to be filled in, and at the end is a long blank in which such notations as are necessary to complete the contract are made. This bill of lading, or so much of it as is pertinent to the matter under consideration, when read as the contracting parties intended, is as follows:

"Smeltzer, Ark., July 19th, 1907.

"**Received from** M. F. H. Smeltzer the following described packages in apparent good order: 525 six-basket crates peaches—O. R. loaded on car F. G. E. 14,442, refrigerator charges $74.25, consigned and marked to Robert T. Cochran & Co., New York, N. Y., to be transported over the line of the St. Louis & San Francisco Railroad Company to St. Louis station, and delivered in like good order to the care of the Big 4 and Empire Line, which line is a part of the route to the place of destination of said freight, it being distinctly understood; 'that the responsibility of each carrier shall not begin until it receives the freight from the consignor or from a connecting carrier and shall cease when it delivers the same to a connecting carrier or to the consignee.

" 'The St. Louis & San Francisco Railroad Company guarantees that the rate of transportation from the place of shipment to ——— shall not exceed the rate noted on this bill of lading and charges advanced by them, provided contents of said packages are correctly stated in the receipts (original and duplicate) on which this bill of lading is issued. This contract is subject to the following conditions: * * * When the words "Owner's Risk" or the letters "O. R." are noted on this bill of lading, the shipper assumes the risk of all loss or damage to the property in the course of transportation, except that arising from carelessness of the carrier, its agents or employés. * * *

" 'No carrier shall be responsible for loss or damage of any of the freight shipped, unless it is proved to have occurred during the time of its transit over the particular carrier's line, and of this, notice must be given within thirty hours after the arrival of same, at destination. * * *

" 'All freight shall be subject to transfer en route, as the necessities or convenience of any carrier requires. * * *

" 'The owner or consignee shall pay charges as per specified rates upon the goods as they arrive.' "

On the face of this bill of lading it is clear that the defendant received "property for transportation from a point in one state to a point in another state," i. e., from Smeltzer, Ark., to St. Louis, Mo.

After so receiving it, the merchandise, eo instanti, became the subject of interstate commerce, and, as such, subject to the regulating power of Congress. When it was so received the act of June 29, 1906 (the Hepburn act), was in full force and effect, and both contracting parties are conclusively presumed to have been acquainted with its provisions. If valid, it became incorporated into the contract as fully as if it had been written into the contract itself, and of necessity had the effect of striking down all provisions in the contract in conflict with it. It would be a waste of time to cite authorities on this point.

Bearing in mind, then, what has been said as to rules governing the courts in construing statutes with reference to the Constitution, the inquiry is how, or in what respect, is the provision of the act of June 29, 1906, quoted above, unconstitutional? This question involves an examination of that act. Defendant's counsel points to the first section of the act, where it is said:

"And it shall be the duty of every carrier subject to the provisions of this act to provide and furnish such transportation upon reasonable request therefor, and to establish through routes and just and reasonable rates applicable thereto."

Also to section 2 of said act, which is as follows:

"That every common carrier subject to the provisions of this act shall file with the Commission created by this act and print and keep open to public inspection schedules showing all the rates, fares and charges for transportation between different points on its own route, and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rates have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print, and keep open to public inspection, as aforesaid, the separately established rates, fares and charges applied to the through transportation. * * * The provisions of this section shall apply to all traffic, transportation, and facilities defined in this act. * * *

"No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this Act. * * *"

Also to section 4 of this act, which is as follows:

"The Commission may also, after hearing on a complaint, establish through routes and joint rates as the maximum to be charged and prescribe the division of such rates as hereinbefore provided, and the terms and conditions under which such through routes shall be operated, when that may be necessary to give effect to any provision of this act, and the carriers complained of have refused or neglected to voluntarily establish such through routes and joint rates, provided no reasonable or satisfactory through route exists, and this provision shall apply when one of the connecting carriers is a water line."

It is urged that the parts of the act quoted above, when taken in connection with the last two paragraphs of section 7 of the act quoted supra, operate to compel a common carrier to enter into contracts with other connecting common carriers, and then holds the former liable for such losses as occur on the line of the latter, and that such compulsion is an invasion of the liberty to contract, which is guaranteed to all persons under the Constitution.

All these provisions must be considered together. All that can be said of the first clause quoted is that it requires common carriers subject to the provisions of the act "to establish through routes and just and reasonable rates applicable thereto." In doing this, the largest liberty of contract is left by this section, unrestricted both as to rates to be established and as to the through routes, and the terms of the routing the carriers are required to make. This is made clearer by the paragraph from section 6 quoted supra, whereby it is required of all railroads subject to the provisions of the act to file with the Interstate Commerce Commission, and print and keep open to public inspection schedules showing all rates between points on its own route, and between points on its own route and points on the route of any other carrier by railroad where a through route and joint rates have been established; and, if no joint rate or through route has been established, the several carriers in such through route are required to print, file, and keep open to public inspection the separately established rates applying to the through transportation; the effect of which is that where the carrier fails for any reason to make joint rates over a through route all carriers on the through route can comply with the law by printing, filing, and publishing their separate rates over their own line, and no joint rates are required to be published unless through routes have been made. It must be said, therefore, that all this paragraph of section 6 amounts to is to require the publication of rates, the constitutional power to do which I do not think is now disputed by any one.

The paragraph quoted above from section 4 must be considered in connection with its context. In that section provision is made for the Commission to fully hear on complaint and fix the maximum rates to be charged by any road subject to the provisions of the act, where it is found by the Commission that any regulation or practice of a carrier or carriers affecting such rate are unjust or unreasonable, or unjustly discriminatory, or unduly preferential or prejudicial, or otherwise violative of the act. It then provides that when it has made an order fixing the maximum rate for a joint route, and the carriers interested cannot agree as to how the rates should be proportioned between them, the Commission may, after a hearing, determine and fix such proportion as each carrier should receive.

But the same paragraph, continuing, provides that when it may be necessary to give effect to any provision of the act, a carrier having refused or neglected to voluntarily establish through routes or joint rates, the Commission may, on complaint, "establish through routes and joint rates as a maximum to be charged, and prescribe the division of such rates as hereinbefore provided, and the terms and conditions under which said through route shall be operated"; but the exercise of this authority conferred on the Commission is subject to the provision that "no reasonable or satisfactory through route exists." Can it be fairly said that these provisions of the act of June 29, 1906, do anything more than require of carriers engaged in interstate commerce to make through routes

and joint rates, and in the event they neglect or refuse to do so, confers power on the Commission to establish, after hearing, through routes, and fix maximum rates, subject, of course, to be reviewed by the courts? In this case, it does not appear that the Commission has ever established through routes or fixed any rates; and hence the last paragraph is not applicable, and nothing is decided in regard thereto.

It is so much a matter of railroad history that through routes and joint rates have for a long time obtained among all the great interstate railroads that the court might well take judicial knowledge of it. The commerce of the country cannot be safely and expeditiously carried on without them. They were the outgrowth of conditions that made them a logical necessity. The Congress have given expression to that fact by the provisions referred to. And can it be fairly said that in doing so it invaded the liberty of contract guaranteed to all persons under the Constitution?

What is this liberty of contract? In Patterson v. Bark Eudora, 190 U. S. 176, 23 Sup. Ct. 821, 47 L. Ed. 1002, the act of Congress passed December 21, 1898, 30 Stat. 763, c. 28 [U. S. Comp. St. 1901, p. 3079], was under consideration. It provided "that it shall be and is hereby made unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages to any other person," and a violation of this act was made a misdemeanor, and the law was made to apply to foreign vessels. The British bark Eudora violated this statute by paying its seamen wages in advance. After the voyage it was sued by the seamen for such wages as had been paid them in advance. Their libel was dismissed by the District Court in Pennsylvania. On appeal, the Circuit Court of Appeals certified two questions raised on the record to the Supreme Court· of the United States. That court said:

"But the main contention is that the statute is beyond the power of Congress to enact, especially as applicable to foreign vessels. It is urged that it invades the liberty of contract which is guaranteed by the fourteenth amendment to the federal Constitution, and reference is made to Allgeyer v. Louisiana, 165 U. S. 578, 589, 17 Sup. Ct. 427, 431, 41 L.· Ed. 832, in which we said: 'The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned.' Further, that even if the contract be one subject to restraint under the police power, that power is vested in the states, and not in the general government, and any restraint, if exercised at all, can only be exercised by the state in which the contract is entered into; that the only jurisdiction possessed by Congress in respect to such matters is by virtue of its power to regulate commerce, interstate and foreign; that the regulation of commerce does not carry with it the power of controlling contracts of employment by those engaged in such service any more than it includes the power to regulate contracts for service on interstate railroads, or for the manufacture of goods which may be intended for interstate or foreign commerce, and, finally, that the validity of a contract is to be determined by the law of the place of performance, and not by that of the place

of the contract; that the contract in this case was not one entered into in the United States, to be performed on board a British vessel, which is undoubtedly British territory, and therefore its validity is to be determined by British law, and that, as conceded in the question, sustains its validity. We are unable to yield our assent to this contention. That there is, generally speaking, a liberty of contract which is protected by the Fourteenth amendment may be conceded, yet such liberty does not extend to all contracts. As said in Frisbie v. United States, 157 U. S. 160, 165, 15 Sup. Ct. 586, 588, 39 L. Ed. 657: 'While it may be conceded that, generally speaking, among the inalienable rights of the citizen is that of the liberty of contract, yet such liberty is not absolute and universal. It is within the undoubted power of government to restrain some individuals from all contracts as well as all individuals from some contracts. It may deny to all the right to contract for the purchase or sale of lottery tickets; to the minor the right to assume any obligations, except for the necessaries of existence; to the common carrier the power to make any contract releasing himself from negligence; and, indeed, may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property.' * * * Contracts with sailors for their services are, as we have seen, exceptional in their character, and may be subjected to special restrictions for the purpose of securing the full and safe carrying on of commerce on the water. Being so subject, whenever the contract is for employment in commerce, not wholly within the state, legislation enforcing such restrictions comes within the domain of Congress, which is charged with the duty of protecting foreign and interstate commerce."

It is thus seen that while the last sentence was obiter in that case, yet the Supreme Court gave its sanction to the doctrine that Congress has the power, under the commerce clause, to enact like legislation applicable to those engaged in interstate commerce. In U. S. v. Col. & Northwestern Railroad Company (not yet officially reported) 28 Sup. Ct. 321, 52 L. Ed. ——, the Eighth Circuit Court of Appeals asserted the same doctrine. It said:

"The power to regulate interstate commerce is as complete upon the land as upon the navigable waters of the nation, and congressional regulation upon the former must be interpreted by the same rules and enforced with the same efficiency as like regulations upon the latter. In re Debs, 158 U. S. 564, 590, 591, 15 Sup. Ct. 900, 39 L. Ed. 1092." See, also, Buttfield v. Stranahan, 192 U. S. 492, 24 Sup. Ct. 349, 48 L. Ed. 525.

In Frisbie v. U. S., 157 U. S. 160, 15 Sup. Ct. 586, 39 L. Ed. 657, Frisbie was indicted under an act of Congress which made it a misdemeanor to contract for, demand, receive, or retain for services rendered in procuring a pension any sum in excess of $10. It was contended the act was unconstitutional, because interfering with the price of labor, and the freedom of contract. The court said:

"Congress being at liberty to give or withhold a pension may prescribe who shall receive it, and determine all the circumstances and conditions under which any application therefor shall be prosecuted. No man has a legal right to a pension, and no man has a legal right to interfere in the matter of obtaining pensions for himself or others. The whole control of that matter is within the domain of congressional power. United States v. Hall, 98 U. S. 343, 25 L. Ed. 180. Having power to legislate on this whole matter, to prescribe the conditions under which parties may assist in procuring pensions, it has the equal power to enforce by penal provisions compliance with its requirements. There can be no reasonable question of the constitutionality of this statute. See, also, Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed.

136, where it is said: 'Under the grant of power to Congress, contained in section 8 of article 1 of the Constitution, "to regulate commerce with foreign nations and among the several states, and with Indian Tribes," that body may enact such legislation as shall declare void and prohibit the performance of any contract between individuals or corporations where the natural and direct effect of such a contract shall be, when carried out, to directly, and not as a mere incident to other and innocent purposes, regulate to any extent interstate or foreign commerce.' "

One can scarcely read the Lottery Case (Champion v. Ames, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492), where many cases are collated illustrating the extent to which Congress has gone in restraining and regulating interstate commerce, and been sustained by the Supreme Court, without the conviction that the act of June 29, 1906, so far as the question now being discussed is concerned, is not open to the objection that it invades the liberty of contract guaranteed under the Constitution. In that case an absolute embargo was laid on the transportation of lottery tickets from one state to another state. The same power has been frequently exercised as to foreign nations, as in the matter of the prohibition of the importation of adulterated tea (192 U. S. 492, 24 Sup. Ct. 349, 48 L. Ed. 525); and also as to the Indian tribes, as in the matter of the introduction and sale of liquors and the prohibition of white persons trading with the Indians unless licensed to do so (93 U. S. 194, 22 L. Ed. 846); and also among the states, as in the case of the prohibition of the introduction of diseased cattle from one state to another state. Other instances might be given, but these serve the purpose in view. If it be said that these cases relate to the health, morals, and welfare of the people, and are in the nature of police regulations, the answer has already been given, that the commerce power is plenary, is not confined or limited by the scope of the ordinary police powers as they are exercised by the state, but is restrained and limited only by the Constitution itself. The sovereignty of the United States, within the powers enumerated and delegated to them by the Constitution, is as complete, plenary, and absolute as the same power was in the states before it was delegated by them, and is therefore not limited to the enactment of mere police regulations affecting the health, morals, and welfare of the people.

In Buttfield v. Stranahan, 192 U. S. 492, 24 Sup. Ct. 349, 48 L. Ed. 525, Mr. Justice White, speaking for an undivided court, said:

"The power to regulate commerce with foreign nations is expressly conferred upon Congress, and being an enumerated power is complete in itself, acknowledging no limitations other than those prescribed in the Constitution. Lottery Case, Champion v. Ames, 188 U. S. 321, 353-356, 23 Sup. Ct. 321, 47 L. Ed. 492; Leisy v. Hardin, 135 U. S. 100, 108, 10 Sup. Ct. 681, 34 L. Ed. 128. Whatever difference of opinion, if any, may have existed or does exist concerning the limitations of the power, resulting from other provisions of the Constitution, so far as interstate commerce is concerned, it is not to be doubted that from the beginning Congress has exercised a plenary power in respect to the exclusion of merchandise brought from foreign countries; not alone directly by the enactment of embargo statutes, but indirectly as a necessary result of provisions contained in tariff legislation. It has also, in other than tariff legislation, exerted a police power over foreign commerce by provisions which in and of themselves amounted to the assertion of the right to exclude merchandise at discretion. This is illustrated by statutory provisions which have

been in force more than fifty years, regulating the degree of strength of drugs, medicines and chemicals entitled to admission into the United States, and excluding such as did not equal the standards adopted. Act June 26, 1848, c. 70, 9 Stat. 237; Rev. St. § 2933 et seq. [U. S. Comp. St. 1901, p. 1936 et seq.].

"The power to regulate foreign commerce is certainly as efficacious as that to regulate commerce with the Indian tribes. And this last power was referred to in United States v. 43 Gallons of Whisky, 93 U. S. 188, 22 L. Ed. 846, as exclusive and absolute, and was declared to be 'as broad and free from restrictions as that to regulate commerce with foreign nations.' In that case it was held that it was competent for Congress to extend the prohibition against the unlicensed introduction and sale of spirituous liquors in the Indian country to territory in proximity to that occupied by the Indians, thus restricting commerce with them. We entertain no doubt that it was competent for Congress, by statute, under the power to regulate foreign commerce, to establish standards and provide that no right should exist to import teas from foreign countries into the United States, unless such teas should be equal to the standards."

In the Lottery Case, supra, the court said:

"The act of July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], known as the 'Sherman Anti-Trust Act,' and which is based upon the power of Congress to regulate commerce among the states, is an illustration of the proposition that regulation may take the form of prohibition. The object of that act was to protect trade and commerce against unlawful restraints and monopolies. To accomplish that object Congress declared certain contracts to be illegal. That act, in effect, prohibited the doing of certain things, and its prohibitory clauses have been sustained in several cases as valid under the power of Congress to regulate interstate commerce. United States v. Transmission Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Addyston Pipe & Steel Company v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136. In the case last named the court, referring to the power of Congress to regulate commerce among the states, said: 'In Gibbons v. Ogden, supra, the power was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the Constitution. Under this grant of power to Congress, that body, in our judgment, may enact such legislation as shall declare void and prohibit the performance of any contract between individuals or corporations where the natural and direct effect of such a contract will be, when carried out, to directly, and not as a mere incident to other and innocent purposes, regulate to any substantial extent interstate commerce. (And when we speak of interstate we also include in our meaning foreign commerce.) We do not assent to the correctness of the proposition that the constitutional guaranty of liberty to the individual to enter into private contracts limits the power of Congress and prevents it from legislating upon the subject of contracts of the class mentioned. The power to regulate interstate commerce is, as stated by Chief Justice Marshall, full and complete in Congress, and there is no limitation in the grant of the power which excludes private contracts of the nature in question from the jurisdiction of that body. Nor is any such limitation contained in that other clause of the Constitution which provides that no person shall be deprived of life, liberty or property without due process of law.' Again: 'The provision in the Constitution does not, as we believe, exclude Congress from legislating with regard to contracts of the above nature while in the exercise of its constitutional right to regulate commerce among the states. On the contrary, we think the provision regarding the liberty of the citizen is, to some extent, limited by the commerce clause of the Constitution, and that the power of Congress to regulate interstate commerce comprises the right to enact a law prohibiting the citizen from entering into those private contracts which directly and substantially, and not merely indirectly, remotely, incidentally, and collaterally, regulate to a greater or less degree commerce among the states." See, also, Minn. Iron Co. v. Kline, 199 U. S. 593, 26 Sup. Ct. 159, 50 L. Ed. 322.

The next contention is that the first paragraph of section 7, supra, from the act of June 29, 1906, is in violation of the fifth

amendment to the Constitution, which prevents any person from being deprived of his property without due process of law, in that it makes the initial carrier liable for any loss that may occur on the line of the connecting carrier on a through route. Assume that it makes the initial carrier liable for losses which occur by reason of the negligence of connecting carriers, and that the initial carrier is deprived of the right to contract against the negligence of the connecting carrier. This being so, does this statute go any further than the statute known as the "Employer's Liability Act"? Before the passage of that act the carrier could not be held liable for an injury to an employé engaged in interstate commerce, resulting from the negligence of a fellow servant. But that act changed the rule in that respect, and gave the injured employé a right of action against the master, although the master was free from any negligence that contributed to the injury. Although that act was held void, because it blended interstate with intrastate commerce so that the two were inseparable, yet six of the nine judges held (the very point suggested being under consideration) that, if the act had been confined to employés engaged in interstate commerce, it would have been constitutional. The same rule has been changed in the same way in almost all of the states, and is upheld without question. Minn. Iron Co. v. Kline, 199 U. S. 593, 26 Sup. Ct. 159, 50 L. Ed. 322; Mo. Pac. Ry. Co. v. Mackay, 127 U. S. 205, 8 Sup. Ct. 1161, 32 L. Ed. 107. In these cases state statutes were under consideration, and a priori an act of Congress of like purport would be upheld under the commerce clause. But at most the act under consideration is only declaratory of what the law was already, as it had been interpreted by the courts of many jurisdictions before the passage of the act of June 29, 1906, as we shall see later.

But it is urged that the last paragraph of section 7, quoted above, is open to the same objection, i. e., that it violates the fifth amendment, because it makes the "receipt, judgment, or transcript" of the case in which payments made by the initial carrier to the shipper for property that is lost on the connecting carrier's line conclusive of the right to recover against the latter. It will be time enough to consider that question when presented in some case where it is necessarily involved. It is not involved in this case, and can never be, for the reason that this case is brought against the initial carrier. It may, however, be remarked in passing, that the right of action over against the connecting carrier, by the initial carrier, for losses on the former's line existed, as we shall see later, in many jurisdictions before the passage of the act of June 29, 1906. The courts, when called upon to construe that paragraph, may conclude that it only created a rule of evidence, at most prima facie. Wintor v. State, 77 Ark. 143, 91 S. W. 7; Adams v. New York, 192 U. S. 585, 24 Sup. Ct. 372, 48 L. Ed. 575. In the last case it was held that it is "within the statutory power of the state to prescribe the evidence which is to be received in the courts of its own government." Nothing, however, is decided on the question, for the reasons already stated. I may add, in passing, that if the courts

should hold the last paragraph of section 7 of the act of June 20, 1906, void because it violates the fifth amendment to the Constitution, still, the preceding paragraph of that section (now in question) would not, necessarily, fall, because the two paragraphs are separable, the validity of the former in no sense depending upon the validity of the latter.

But there is another aspect of this case that cannot be overlooked in considering this motion. Suppose it should be admitted that the contention of defendant's counsel is sound, and that the provisions of the statute quoted, when considered together, operate to compel defendant to enter into the contract for the shipment of the fruit over through routes upon joint rates established by or under compulsion of law, and that it is prohibited by that law from contracting against liability beyond its own line, and that this was a violation of its liberty to contract! How is the compulsion in this case made to appear? It does not appear in the complaint or bill of lading. As to whether the contract for the shipment was voluntarily made or made under compulsion is a question of fact, upon which both parties are entitled to be heard. It cannot be presumed that it was made under compulsion, because there is nothing unusual in through-routing or joint rates. Substantially this form of contract was in use long before the act of June 29, 1906, was passed, and containing, as in this case, provisions against the liability of the initial carrier beyond its own line. The books are replete with such cases, construing such contracts, and conflicting conclusions have been reached as to the liability of the initial carrier. 48 N. H. 339, 2 Am. Rep. 242. For aught that appears, how can the court know that the arrangement for through routes and joint rates in this case was not made, between the initial carrier and the connecting carriers, long before the act of June 29, 1906, was passed, and this very contract made under such an arrangement? In that event the only question would then be, whether the provision in the act of June 29, 1906, striking down the right of a railroad to contract against loss beyond its own line, was valid. To state the matter in another form, this contract, we will assume, was made voluntarily and not under compulsion; it was to transport freight from a point in one state to a point in another state; the Hepburn act in such case made the initial carrier liable for all loss or damage to the freight, whether it occurred on its own line or connecting lines. Is such an act, in such a case, void? To state the question, it seems to me, is to answer it, for the simple reason that the Hepburn act, being in force, became a part of the contract, and all other parts of the contract in conflict with it were stricken down by the act.

But let us look further as to what obligations were assumed in the bill of lading sued on. Did this bill of lading obligate the initial carrier to deliver the shipment of fruit to the consignee in New York, or was it discharged from all responsibility when it delivered the fruit to the Big 4 railroad at St. Louis station? If its obligation required it to deliver the goods to the consignee at New York, is it not responsible to the shipper, independent of the Hep-

burn act without regard to where the loss occurred? It is a principle of law that no one can contract against his own negligence, and the carrier is the insurer of the goods in transit against everybody, except the act of God and the public enemy. 17 Wall. 357–381, 21 L. Ed. 627. If the carrier undertakes to deliver the goods at a point requiring them to pass over connecting lines, are not· such lines the carrier's agents, and why is not the carrier as much bound for its agent's negligence as for its own? The complaint and the bill of lading taken together show that the shipment of peaches was received by the defendant at Van Buren, Ark., consigned to Robert T. Cochran & Co. of New York, care of Big 4 and Empire line; that the freight and icing charges were agreed upon covering the shipment to the point of destination; that the fruit was to pass over defendant's line to St. Louis station, and there to be delivered to the Big 4 railroad, the initial carrier guaranteeing the rates and charges to point of destination. The right to transfer the fruit en route, when the necessities of any carrier required was reserved in the contract made with the initial carrier; the charges were to be paid by the consignee on arrival at New York. Let us examine this contract in the light of the adjudicated cases, and see what construction shall be placed upon such a bill of lading, and how the questions above suggested should be answered.

In Taylor, Cleveland & Company v. L. R. Miss. River & Texas R. R. Co., 32 Ark. 393, 29 Am. Rep. 1, the court said that the initial carrier can stipulate against liability for loss beyond its own line. R. R. Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627. The facts in that case were very similar to those in this case. The common-law rule is exactly the reverse. R. R. Co. v. Lockwood, supra. In Railroad Co. v. Lockwood, Mr. Justice Bradley, whose erudition enabled him to adorn any subject he treated, reviewed the decisions of a large number of the states, as well as the decisions and the course of legislation in England on this subject, and deduced therefrom, among other things, the following principles of law: First, a common carrier can stipulate against its common-law liability as long as the stipulations are reasonable and just, but it cannot stipulate against its own negligence, or that of its servants or agents; second, a common carrier cannot, by stipulation, lose its character generally as such and become a mere bailee; third, the federal courts are not bound by state decisions in this class of cases, it being a commercial question. That case did not involve the liability of an initial carrier beyond its own line; but the case of R. R. Co. v. R. R. Co., 110 U. S. 688, 4 Sup. Ct. 185, 28 L. Ed. 291, does involve that very question, and the court said:

"At common law, a carrier is not bound to carry except on his own line, and we think it right clear that if he contracts to go beyond he may, in the absence of statutory regulations to· the contrary, determine for himself what agencies he will employ. His contract is equivalent to an extension of his line for the purposes of the contract, and if he holds himself out as a carrier beyond the line, so that he may be required to carry in that way for all alike, he may nevertheless confine himself in carrying to the particular route he chooses to use. He puts himself in no worse position, by extending his route with the

help of others, than he would occupy if the means of transportation employed were all his own. He certainly may select his own agencies and his own associates for doing his own work."

In Railroad Co. v. Pratt, 22 Wall. 123, 22 L. Ed. 827, the suit was brought in Massachusetts by attachment, against the Ogdensburg & Lake Champlain R. R. Co., a New York corporation, which was the initial carrier, to recover from that company damages for the loss of certain horses shipped by plaintiff, who had put them in two cars of defendant company in New York, and which were burned to death, not on the defendant's road, but on the Vermont Central Railroad, a Vermont corporation connecting with the former, but not belonging to the same corporation. The Vermont railroad, near the southeastern boundary of Vermont, connected with another road which entered Boston. The horses were shipped from Potsdam, N. Y., to Boston, over these three roads. The contract price was $85 per car to Boston, and the contract itself is substantially the same as the one in this case, except there seems to have been no express contract limiting the liability to the road on which the loss occurred. The fire which burned the cars resulted from a defective roof on the cars, which permitted the sparks to ignite the hay placed in them for the horses to stand on. The court said:

"First. As to the power of the railroad company to contract as a common carrier for the transportation of property beyond the terminus of its own road. The distinction between the liability of a carrier, in carrying goods upon its own line, and in forwarding them when the duty to carry is at an end, is well defined. In the language of Mr. Justice Davis, in Railroad Company v. Manufacturing Company, 'it is the duty of the carrier, in the absence of any special contract, to carry safely to the end of his line, and to deliver to the next carrier in the route beyond. * * *' The fair result of the American cases limits the carrier's liability as such, when no special contract is made, to his own line, although there are cases which hold the liability as continuing the same throughout the whole route, and such is the English doctrine. A discussion on this point is unnecessary, as the judge on the trial held the rule as we have stated it, and as was most favorable to the defendants. He charged the jury that the defendants were only liable upon a contract to be proved that they had assumed a liability beyond that imposed by law. * * * Assuming the case to stand upon the general principles applicable to the question, the doctrine that a railroad company may subject itself to the obligations of a carrier beyond its own line has been distinctly held in the state of New York, where this contract was made; in the state of Massachusetts, where its performance was to be completed; and in the state of Vermont, where the alleged injury occurred. In the case of Burtis v. Buffalo & St. Lawrence Railroad, 24 N. Y. 269, it was held that this principle applied to connecting roads extending beyond the limits of the state. The single exception to this holding, so far as we are aware, is in the state of Connecticut, where the contrary has been held by its Supreme Court. This case, however, does not stand upon the general principle only. By the statutes of New York it is enacted as follows: 'Any railroad company receiving freight for transportation shall be entitled to the same rights and subject to the same responsibilities as common carriers. Whenever two or more railroad companies are connected together, any company owning either of said roads receiving freight to be transported to any place on the line of either of said roads so connected shall be liable as common carriers for the delivery of such freight at such place. In case any such company shall become liable to pay any sum by reason of the neglect of any other company or companies, the company paying such sum may collect the same of the company by whose neglect it became so liable.' This statute is declared by Rapallo, J., in Root v. Great Western Railroad, 45 N. Y. 524, to

be declaratory merely. We do not see that there is room to doubt the power of the company to make the contract in question."

So here, I think the act declaratory merely, as to this precise point. The court then considered the question whether there was evidence to show that the initial carrier contracted to transport the horses beyond its own terminus, and over other roads, to Boston. There was oral evidence, and the waybill was also introduced. The court said:

"This evidence shows that the oral engagement was 'to carry his horses to Boston,' not to carry to Rouse's Point and thence to forward to Boston, but 'to carry' as well and as fully over the Vermont and Massachusetts roads as over the Ogdensburg road. Again, a specific price was agreed upon for transportation over the whole route. This was in accordance with the practice, and whether paid at Potsdam or at Boston was unimportant. This practice had been continued for years, and the jury had the right to hold the contract to be the same, without reference to prepayment or postpayment. The jury were justified in inferring that where a carrier fixes a price for transportation over the whole route, that he makes the entire contract his own. One who carries simply over his own line, and thence forwards by other lines, would ordinarily, the jury may say, make or collect his own charges and leave the remaining charges to be collected by those performing the remaining service. Receipt of the entire pay affords a fair presumption of an entire contract. The language of the waybill is quite expressive. It describes 'merchandise transported * * * from Potsdam to Boston.' 'Transported' or 'carried' are equivalent terms, and quite distinct from the idea of forwarding. Whether looked upon as a contract, or as a declaration, or as an admission simply, the waybill furnishes evidence that the Ogdensburg Company undertook to carry the horses to Boston. In Root v. Great Western, in speaking of the contract to transport as a common carrier over other lines, the court say: 'Such an undertaking may be established by express contract, or by showing that the company held itself out as a carrier for the entire distance, or received freight for the entire distance, or other circumstances indicating an understanding that it was to carry through.' We think there was competent evidence before the jury that the company undertook to carry this property to Boston, and the jury having found such to be the fact, the other companies are to be deemed the agents of the defendants, for whose faults they are responsible."

The question is considered, then, whether the Vermont road was the agent of the initial carrier, and the court said:

"The authorities sustain the position taken by the judge at the trial. In New Jersey Steam Navigation Company v. Merchants Bank, 6 How. 344, 12 L. Ed. 465, Mr. Justice Nelson says: 'If it is competent at all for the carrier to stipulate for the gross negligence of himself and servants or agents in the transportation of goods, it should be required to be done at least in terms that would leave no doubt as to the meaning of the parties.' To this effect are the New York and Massachusetts cases before cited. In Railroad Company v. Manufacturing Company, 16 Wall. 318, 21 L. Ed. 297, it was declared that the court did not intend to relax the rule by which the liability of carriers was established. In Railroad Company v. Lockwood the following, among other propositions, were reiterated and established by the unanimous judgment of the court: (1) That a common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law. (2) That it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants. The judge at the trial of this case might have gone much further than he did, and have charged that if the jury found the company to have been negligent and careless in furnishing cars, they would not be relieved from responsibility, although there had been an agreement that they should not be liable therefor."

Bank of Kentucky v. Adams Express Company, 93 U. S. 174, 23 L. Ed. 872, is a case strongly in point. The Southern Express Company had received in New Orleans, La., two packages of money to be delivered to certain banks in Louisville, Ky. That company conveyed the packages to Humbolt, Tenn., and delivered them to the Adams Express Company, which was also the agent of the Southern Express Company between Humbolt and Louisville. By reason of the negligence of the railroad company over which the packages were being carried, a trestle gave way, the car was precipitated below, the messenger disabled, and the packages burned by fire which started from the locomotive. The ordinary agreement between the express companies and the railroad company for transporting express matter subsisted, and the two express companies were shown to be engaged in transporting the packages from New Orleans to Louisville, Ky. The question was whether the railroad company was the agent of the express company and therefore the express companies liable, or was the railroad liable because of its own negligence to which the loss was directly attributable. The court said:

"The railroad company, in transporting the messenger and the express matter in his charge, was the agent of somebody; either of the express company, or of the shippers or consignees of the property. That it was the agent of the defendants is quite clear. It was employed by them and paid by them. The service it was called upon to perform was a service for the defendants; a duty incumbent upon them, and not upon the plaintiffs. The latter had nothing to do with the employment. It was neither directed by them, nor had they any control over the railroad company or its employés. It is true the defendants had also no control over the company or its servants; but they were its employers, presumably they paid for its service; and that service was directly and immediately for them. Control of the conduct of an agency is not in all cases essential to liability for the consequences of that conduct. If any one is to be affected by the acts or omissions of persons employed to do a particular service, surely it must be he who gave the employment. Their acts become his, because done in his service and by his direction. Moreover, a common carrier who undertakes for himself to perform an entire service has no authority to constitute another person or corporation the agent of his consignor or consignee. He may employ a subordinate agency; but it must be subordinate to him, and not to one who neither employs it nor pays it, nor has any right to interfere with it."

The court held the express companies liable, saying:

"Public policy demands that the right of the owners to absolute security against the negligence of the carrier, and of all persons engaged in performing the carrier's duty, shall not be taken away by any reservation in the carrier's receipt, or by any arrangement between him and the performing company."

This doctrine is ably fortified by the case of Nashua Lock Company v. Worcester and Nashua Railroad Company, 48 N. H. 339, 2 Am. Rep. 242. The opinion was delivered in 1869. In that case the authorities in England and America are collated, considered, and weighed in the light of reason and authority, and the convenience and necessities of commerce at that day, and the conclusion is this:

"Where several common carriers are associated in a continuous line of transportation, and, in the course of the business, goods are carried through the connected line for one price under an agreement by which the freight money is divided among the associated carriers, in proportions fixed by the agreement; if the carrier at one end of the line receives goods to be transported

through marked for a consignee at the other end of the line, and on delivery of the goods takes pay for transportation through, the carrier who so receives the goods is bound to carry them, or see that they are carried to their final destination, and is liable for an accidental loss happening in any part of the connected line."

I need not multiply authorities, or take up further time in this matter. This court is bound by the cases in 110 U. S. 688, 4 Sup. Ct. 185, 28 L. Ed. 291, and 22 Wall. 123, 22 L. Ed. 827, and the case in 48 N. H. 339, 2 Am. Rep. 242, has his unqualified approval.

In the case at bar the bill of lading contains this provision:

"When the words 'Owner's Risk' or the letters 'O. R.' are noted on this bill of lading, the shipper assumes the risk of all loss or damage to the property in the course of transportation, except that arising from carelessness of the carrier, its agents or employés."

It will thus be seen that there was no effort in this case on the part of the initial carrier to contract against its own carelessness, or that of its agents or employés. I conclude that prima facie the Big 4 and the Empire lines where, under this contract as it now appears of record, the agents of the defendant, and that it could not contract against its liability for the negligence of its own agents, and that the seventh section of the act of June 29, 1906, strikes down the provision in the bill of lading exempting the defendant from liability for loss occurring on the lines of its agents or connecting carriers.

In Minnesota Iron Co. v. Kline, 199 U. S. 593–598, 26 Sup. Ct. 159, 50 L. Ed. 322, that court said:

"It was not argued that the statute was bad as interfering unduly with freedom of contract. There is no doubt that that freedom may be limited where there are visible reasons of public policy for the limitation. Holden v. Hardy, 169 U. S. 366–391, 18 Sup. Ct. 388, 42 L. Ed. 780."

Instances of this may be found under the decisions based on state statutes. Hooper v. California, 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297; Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 388, 42 L. Ed. 780. Orient Ins. Co. v. Daggs, 172 U. S. 557, 19 Sup. Ct. 281, 43 L. Ed. 552; Ozan Lbr. Co. v. Union Co. Nat. Bank of Ind. (not yet officially reported) 28 Sup. Ct. 89, 52 L. Ed. ——.

The Congress recognize the difficulty shippers, especially small shippers, had when goods were lost, and especially when they were damaged, to trace the goods and fix the liability and recover their loss. Not unfrequently the effort to do so involved more time and expense than the value of the goods damaged or lost. It recognized the additional fact that the facilities of the initial carrier were much greater than those of the shipper to locate the goods and fix the liability for loss or damage, and that it was, at all events, easily within the power of the carriers to adopt methods by which it could be done; methods, too, which were absolutely denied the shippers by reason of manifestly insuperable obstacles and conditions. The evident purpose of Congress in the enactment of the statute under consideration was to enable the shipper to have recourse to the receiving carrier, and leave it to its recourse upon the particular company which inflicted the injury. The act, I

think, rests on a substantial and visible reason of public policy, which must address itself to every fair mind cognizant of the conditions which inspired this remedial legislation regulating the immense volume of interstate commerce in this vast country. I do not share the evil forebodings of the learned counsel for defendant in respect to this statute, if upheld by the court; but, if I did, the result could not be otherwise. The question is not one of policy; it is one of law. I do not think it is in conflict with the Constitution for any reason; but clearly within its constitutional purview.

The motion is overruled.