### ATLANTIC COAST LINE R. CO. v. GERATY.

(Circuit Court of Appeals, Fourth Circuit. November 5, 1908.)

No. 753.

1. CARRIERS (§ 44*)—PERISHABLE FREIGHT—REFRIGERATOR CARS—DUTY TO FURNISH.

Where a carrier, having facilities for furnishing shippers of vegetables refrigerator cars in which to transport the same, which cars the carrier

did not own as a part of its equipment, had led plaintiff and other vegetable growers in the region to expect that, if they raised vegetables, refrigerator cars necessary for their proper transportation would be obtainable, plaintiff was entitled to recover damages sustained by the carrier's refusal to furnish refrigerator cars for the transportation of plaintiff's cabbages on reasonable demand.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 120–122; Dec. Dig. § 44.*]

2. CARRIERS (§ 44*) — TRANSPORTATION FACILITIES — REFRIGERATOR CARS—REFUSAL TO FURNISH—TENDER OF FREIGHT.

Where plaintiff, owning a farm in a truck region, was induced to plant a large quantity of cabbages by assurance of defendant railroad company that refrigerator cars would be furnished to transport the cabbage to market, which it refused to do on reasonable demand, plaintiff was entitled to recover for unharvested cabbage which spoiled because of defendant's refusal to furnish refrigerator cars, plaintiff after such refusal not being bound thereafter to tender the cabbage for shipment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 120–122; Dec. Dig. § 44.*

Duties and liabilities of carriers as to furnishing facilities for transportation, see note to Harp v. Choctaw, O. & G. R. Co., 61 C. C. A. 414.]

Waddill, District Judge, dissenting.

In Error to the Circuit Court of the United States for the District of South Carolina, at Charleston.

W. H. Fitz Simons, for plaintiff in error.
W. A. Holman, for defendant in error.

Before PRITCHARD, Circuit Judge, and MORRIS and WADDILL, District Judges.

MORRIS, District Judge. This is an action at law brought by the plaintiff, Geraty, against the railroad company to recover damages for losses on early cabbages shipped, or intended to be shipped, from a station on the railroad called Meggets, in South Carolina, and destined for places in the West in the month of May, 1905. It is claimed that for proper transportation of the cabbages the only proper cars were refrigerator cars, and that the railroad failed to furnish refrigerator cars, although seasonably notified by the plaintiff; and that in consequence the cabbages which were shipped, being transported in unsuitable cars, became decayed and worthless and were a total loss, and those which were ready to be cut, crated, and shipped on refrigerator cars, the plaintiff being notified by the railroad company that the refrigerator cars would not be furnished, could not be saved and perished in the fields. The jury returned a verdict of $7,466.96. Upon a motion for a new trial, the learned trial judge held that the verdict was excessive, in that a large part of the damages allowed was for loss on cabbages not actually cut or tendered for shipment, as to which the loss was to a large extent speculative, and directed that unless all of the verdict in excess of $4,000 was remitted there should be a new trial. Thereupon the plaintiff remitted the excess, and judgment was entered for $4,000 and costs. The railroad company sued out this writ of error.

The assignments of error all relate to the instructions of the trial court with respect to the duty of the railroad to furnish the refrigerator cars in compliance with the demands of the plaintiff, and as to whether the plaintiff could recover anything for cabbages not actually tendered for shipment. The testimony tended to show that it had been the custom of the railroad company for some years prior to 1905 to furnish refrigerator cars for the transportation of early cabbages. That the demand increased from year to year. That the railroad company did not own the refrigerator cars as part of its own equipment, but they were supplied by independent car companies by some arrangement between the railroad company and the car companies. There was testimony to show that the railroad, in order to reach the truck planters of the territory where the plaintiff had his farms, had built spurs of railroad running through the fields, and that agents of the railroad and of the car companies had gone through the territory early in the season to get information as to the acreage planted with each kind of vegetable, and asking the farmers what time their crops would probably be ready for shipment and in what quantities. There was testimony tending to show that, while the cabbage crop of 1905 was large, it was not larger than what might reasonably have been expected from the acreage planted, and that of this the railroad company and the car companies either actually had information or had the means of knowing.

The defendant asked the court to instruct the jury as follows:

"(1) The railroad company as a common carrier is not bound to furnish refrigerator cars for transportation of cabbage."

The court said:

"The court refuses to give you that instruction. The law on the subject is this: It is the duty of the railroad company, holding itself out as a common carrier of vegetables, to provide suitable and necessary means and facilities for the proper transportation of such vegetables. Such proper means and facilities depend upon the nature of the article to be transported, and the necessities of the respective localities in which it is to be received. * * * It is the duty of the railroad company engaged as a common carrier to study the wants of each community, and to keep pace with a growing demand for such facilities of transportation as may be needed. It is for you to say in this case whether the railroad company has performed its duty in that respect, and, while the court has refused to charge you that it is not the duty of the railroad company to furnish refrigerator cars, it must also state that its duty in this particular case depends upon circumstances. Now, it appears that prior to 1901 these refrigerator cars were little used, if used at all, for the transportation of cabbage, and consequently, if you believe that testimony— and there is no reason why you should not—the railroad company could not justly be required to keep on hand a large number of refrigerator cars which were only of use for certain purposes and only required at a certain season of the year; but it was the duty of the company to provide, as far as they reasonably could, for the growing demand for refrigerator cars. That business, although it was conducted by private companies, was a business so intimately connected with the business of the defendant as a common carrier that it granted to the agents of that company facilities for drumming up that kind of business, allowing these agents to go down and induce these truck farmers to make use of the refrigerator cars. It therefore remained the duty of the railroad company, as far as it reasonably could, to respond to the demands which they thus permitted to be created, and if you find from the

testimony that they held themselves out to furnish refrigerator cars, then it is for you to say whether in this particular case they have violated their duty in failing to furnish them.

"The testimony shows that prior to 1905—that is, prior to the time when this suit had its origin—the railroad company and the owners of refrigerator cars had furnished the people at Meggets 51 cars, and, so far as the testimony shows, that number of cars seemed to be all that was required at that locality. Now it is for you to say whether there is any testimony to satisfy you that the increased demand in the neighborhood of Meggets would be so great as to require it to furnish more than it actually did furnish. The testimony is that in 1905 it furnished about 130 or 140 refrigerator cars. Now it is a question for you whether the railroad company had any notice or reasonable ground to believe that the demand for these refrigerator cars was greater than the number which it was prepared to furnish. If you believe from the testimony that they had no reasonable ground to believe that there would be an unusual demand for refrigerator cars at Meggets that season, then it cannot be imputed to the railroad company as a fault for which it is liable in damages that it failed to respond to this unusual demand, if you believe that it was an unusual demand. So that it seems to the court that the case turns upon that point. The railroad undoubtedly was advised through its agents, actually advised, and it was its duty to be advised whether it was or not, as to the amount of truck planted in that neighborhood, as it was advised as to the quantities of truck vegetables planted in other neighborhoods.

"Now, whether there was such an increase in the amount of cabbage planted down there over previous years the testimony, so far as the court recalls it, does not disclose. There is probably sufficient evidence to show that there was a gradual increase in the trucking business in that section, but whether there was reasonable ground for the railroad company to prepare such a number of refrigerator cars as seems to have been demanded is a question for you to decide from the testimony. While the company as a common carrier should be held to a very high degree of care and duty responding to the demands of its patrons, it should not be held to respond to an unreasonable demand, and you will take the testimony and from that determine whether the railroad company had such notice beforehand that this unusual number of refrigerator cars would be required.

"It appears that the first demand proved in this case was on May 4th, and the cars were required the next day. If you believe from the testimony that it was possible for the railroad to respond to that demand, send the cars the next day, and that it failed to do it, then it would be responsible; but if you believe from the testimony that it had no notice beforehand that such an unusual number of refrigerator cars was to be required, it could not justly be held responsible for failing within a day or two days to respond to that demand, for these cars, it appears from the testimony, were not owned by the railroad company itself. They were provided by other companies, and the railroad company had to make its arrangements, and in the nature of the case some time ought reasonably to be expected to be given before it could be held responsible for failure to send the cars.

"But the whole question, to the mind of the court, depends upon this: as to whether the company had reasonable ground to believe that at that season at Meggets these cars would be demanded in time to have made provision for them. If it had, then it was its duty to provide those cars in some way or other."

Having given these instructions to the jury, the learned trial judge proceeded to pass upon the special propositions of law submitted on behalf of the defendant railroad company, as follows:

"(2) Unless the jury believe that the railroad company held itself out as conducting a refrigerator car business for the furnishing to shippers refrigerator cars for the shipment of cabbage, then the railroad company cannot be held liable for any injury to the plaintiff arising by his inability to procure refrigerator cars."

The court said:

"That instruction is given. That is, if the railroad company, by its course of business, held itself out to the community at Meggets as ready to furnish refrigerator cars, it should have furnished them; and the testimony you have heard on that point is that they not only did hold themselves out, but that it actually furnished cars, for the court holds that cars furnished by these car lines and by the railroad are practically the same thing. If it knew of the demand for refrigerator cars in that neighborhood and undertook to supply that demand, whether through itself or through the agency of other car lines, it is all the same."

The third instruction asked by the defendant was:

"(3) If the jury believe that the demands for refrigerator cars for shipment of strawberries and cabbage was of unusual volume, and that the requests for refrigerator cars were made at the time when the railroad company could not obtain the refrigerator cars from the refrigerator companies, then the railroad company is not responsible for any injury the plaintiff suffered by reason of the failure to obtain refrigerator cars."

The court said:

"The court has already practically given you that instruction, and it gives it to you."

The sixth instruction asked for by the defendant was as follows:

"(6) If the jury believe that the railroad company only obtained refrigerator cars from the refrigerator company, and that at the time he made his requests it was impossible for the railroad company to procure such cars from the refrigerator company, then the railroad company would not be responsible to the shipper for failure to obtain refrigerator cars."

The court said:

"The court gives you that instruction, to be taken in connection with what it has already said. The question is whether they knew or had reasonable cause to believe that there was going to be this great demand for refrigerator cars at Meggets at that time, a demand two or three times greater than that of the preceding year. That seems to the court the turning point in the case, for the demand was actually made on May 4th for cars for the next day; if the railroad company was not in possession of the cars and had to obtain them from other sources, and although the court has charged you, and charges you again, that it was its duty to have foreseen the demand so far as it reasonably could, and to have provided suitable means of transportation, yet if it had no reasonable cause to believe that there was going to be a great demand for refrigerator cars, and it was impossible at the late date at which the formal demand was made to comply with it, that would relieve it from its liability."

The eighth instruction asked for by the defendant was as follows:

"(8) If the jury believe that the number of refrigerator cars provided by the refrigerator company to the plaintiff was equal to all reasonable expectation said company had of the demands for such cars in that season, then the railroad company would not be responsible for a sudden and unexpected demand for that kind of equipment."

The court said:

"The court gives you that instruction. It has so expressly charged you, and that really seems the turning point in the case."

The fourth instruction asked for by the defendant had reference to the plaintiff's claim for cabbage which rotted in the fields, the plaintiff not having cut and crated them because the railroad company

had notified the plaintiff that it could not furnish the cars. The fourth instruction asked for by the defendant was as follows:

"(4) The jury are charged that, unless a shipper tenders his freight to the carrier in proper condition for shipment and at a reasonable time, the railroad company is not responsible for loss occasioned thereby; and in this case the jury is charged that no recovery can be had against the railroad company for that portion of Mr. Geraty's crop which perished in the field, was nevel crated, or tendered to the railroad company for shipment."

The court said:

"The court cannot give you that instruction. If you find from the testimony that in the circumstances of the case the railroad was bound to furnish refrigerator cars to Mr. Geraty upon his demand made at the time stated, and that it notified him that it could not furnish the cars, there was no reason why Mr. Geraty should go to the additional expense of cutting and crating his cabbages in order to ship them. If you believe the cabbages were there and ready to be crated and to be shipped in the event he could get the cars, then the company is just as liable as if the cabbages had been actually cut and crated and put up for shipment. The railroad company, of course, is not responsible as an insurer of truck farmers; it does not insure them against weather, or against the conditions of the market, and it cannot be held responsible for any loss that may have been sustained from any other cause than its own negligence, failure to do its duty, as the court has instructed you its duty was."

At the instance of the plaintiff the court instructed the jury as follows:

"(1) The jury is instructed that it is the duty of a common carrier to use every reasonable effort to provide suitable means of transportation for the carrying of all truck vegetables and other products raised for the markets, and that a railroad company for its failure to furnish cars or other means of transportation cannot shield or relieve itself by showing that it does not own such cars or such equipment."

And at the instance of the plaintiff the court instructed the jury as follows:

"(3) The jury is instructed that a common carrier of freight cannot relieve itself of liability for the failure to furnish suitable and proper cars for the transportation of vegetables and other perishable truck on the ground that it owns no such equipment, and that the same has to be secured from another company: but that such common carrier is primarily liable to the shipper for the failure to furnish such cars."

The defendant excepted to the granting of the first and third instructions asked for by the plaintiff, and to the refusal to grant the first and fourth instructions asked for by the defendant.

The trial judge's instructions to the jury should be considered as a whole. The jury were told that the granted instructions were to be taken in connection with what the court had already said to them. In no other way could the law of the case be presented. The jury were plainly told that, in the first place, whether or not the railroad company was liable at all for not furnishing refrigerator cars, depended upon whether or not it had held itself out to shippers of early cabbages as engaging in that special character of transportation. In the next place, the jury was told, if the quantity tendered for shipment was unusually large, and the railroad company had no reason to expect the increased demand for refrigerator cars, then the railroad com-

pany was not liable for not meeting an unusual and unexpected demand. These conditions of liability were clearly and fully explained in the court's instructions. There was testimony to support the contentions of both sides, and the finding of the facts was properly left to the jury. There was testimony to show that the railroad company, through the car companies, led truck growers in that region to expect that, if they raised the vegetables, the refrigerator cars necessary for their proper transportation would be obtainable. That the finding of this fact was necessary to the plaintiff's right of action was very plainly and clearly explained to the jury by the learned judge's instructions. This statement of the law we think correct. Covington Stockyards Company v. Keith, 139 U. S. 128–133, 11 Sup. Ct. 461, 462, 35 L. Ed. 73. It was said by Mr. Justice Harlan in that case:

"The railroad company, holding itself out as a carrier of live stock, was under legal obligation, arising out of the nature of its employment, to provide suitable and necessary means and facilities for receiving live stock offered to it for shipment over its road and connections, as well as for discharging such stock when it reaches the place to which it is consigned. The vital question in respect to such matters is whether the means and facilities so furnished by the carrier or by some one in its behalf are sufficient for the reasonable accommodation of the public. * * * The carrier must at all times be in proper condition both to receive from the shipper and to deliver to the consignee, according to the nature of the property to be transported as well as the necessities of the respective localities in which it is received and delivered."

This is not the case of a railroad carrying ordinary freight being called upon to provide unusual facilities. The testimony tends to show that Meggets was the station of a great truck growing region, and that the railroad had constructed spurs of tracks running into it for the purpose of transporting the products grown there, and had been furnishing refrigerator cars in previous years, and had permitted the car companies furnishing the refrigerator cars, under some arrangement with the railroad company, to solicit the business. When, encouraged by these facilities, the farmers gradually increased the acreage under cultivation with the knowledge of the railroad company, it could not be successfully contended that the railroad company fulfilled its duty to provide proper instrumentalities of transportation, if, when a perishable crop was ready for the market, the grower was obliged to let it perish for want of proper cars. All the findings of fact necessary to impose the duty on the defendant railroad were left to the jury. There was evidence from which the jury was justified in finding them, and we think they were sufficient to support the verdict.

As to the cabbages which, because of notice from the railroad company that the cars would not be furnished, the plaintiff, although he had them at hand, did not incur the useless expense of tendering them, we think the ruling of the trial court was correct. The cabbages were of no value unless they could be shipped to markets where they were in demand. They were grown for that purpose. They would not have been grown but for the expectation and previous experience that the railroad would transport them so as to arrive in a salable condition. The failure to furnish the refrigerator cars directly destroyed their value. Undoubtedly, the amount of a claim of this kind should be closely scrutinized. In this case the computation was rendered less

uncertain by the fact that the plaintiff was not obliged to ship his cabbages to a distant market for sale, but sold them deliverable on the cars at his shipping station, the purchasers agreeing to accept them f. o. b. the cars, provided they were shipped in refrigerator cars. That the learned trial judge did exercise careful scrutiny of the damages arising from the loss of sales is shown by his requiring as a condition of refusing a new trial a remission of nearly 50 per cent. of the jury's assessment of the loss.

Finding no reversible error, the judgment is affirmed.

WADDILL, District Judge (dissenting). I am unable to concur with the majority of the court in this case. While it is true the question presented is one of difficulty, and the lower court, in the instructions given, has shown much ability in reaching what would appear to be a fair solution of the same, yet I cannot see how, under the circumstances of this case, the carrier could have met the requirements imposed upon it, or have escaped liability, although it had substantially done so.