MIDLAND VALLEY RAILROAD COMPANY *v.* HOFFMAN COAL COMPANY.

Opinion delivered May 10, 1909.

1. INTERSTATE COMMERCE—JURISDICTION OF STATE COURTS.—The State courts have jurisdiction of actions brought to recover damages from a railroad company for breach of its common-law or contractual duty when requested to furnish cars for shipment of freight to other States. (Page 187.)

2. REMOVAL OF CAUSES—TIME FOR FILING PETITION.—A petition for removal of a cause to a federal court which is filed after the time allowed by the statutes of the State or the rules of the court for filing answers is too late, and it is immaterial that the defendant may have obtained further time to answer by stipulation with the plaintiff or by order of court. (Page 189.)

3. CARRIERS—FAILURE TO FURNISH CARS—DEFENSE.—A railroad company, when sued for breach of its common-law or contractual duty to furnish cars for shipment of coal, may not defend upon the ground that plaintiff is a member of a pool or trust to regulate and control the price of coal. (Page 190.)

4. SAME—FAILURE TO SHIP FREIGHT—EXPECTED PROFITS AS DAMAGES.—To the general rule that the expected profits of a commercial business are too speculative to warrant a judgment for their loss there is an exception, namely, that the loss of profits from the interruption of an established business may be recovered where the plaintiff makes it reasonably certain what the amount of his loss actually was. (Page 192.)

5. SAME—WHEN EXPECTED PROFITS RECOVERABLE.—Where plaintiff, a coal miner, had an established business, and defendant railway company had contracted to furnish cars for coal shipments as needed, and had bound plaintiff not to ship over a rival road, and defendant knew that plaintiff could not conduct its business unless cars were furnished daily, the net profits of operating plaintiff's mine were in contemplation of the parties as damages for a breach of the contract to furnish cars for the shipment of plaintiff's coal at the time such contract was entered into. (Page 194.)

6. TRIAL—ORDER OF INTRODUCTION OF EVIDENCE.—While it was irregular to permit plaintiff in making out its case to introduce rebutting evidence in anticipation of the defense, such matters are within the court's discretion, and will not be ground for reversal unless prejudice is shown. (Page 194.)

7. EVIDENCE—NET PROFITS OF MINE.—In an action against a railway company for failure to furnish cars at a coal mine for the shipment of coal, it was proper to admit evidence with reference to the effect of the failure to furnish cars upon the expense of maintaining the mine and also as to the cost of mining the coal, such evidence being admissible in arriving at the net profits of the mine. (Page 195.)

8. CARRIERS—FAILURE TO FURNISH CARS—UNPRECEDENTED DEMAND.—In an action against a railway company for failure to furnish cars for the shipment of plaintiff's coal, it was error to charge the jury absolutely that the fact that connecting lines have failed and refused to return defendant's cars is no valid excuse for its failure to furnish cars; the evidence showing that defendant under its contract with plaintiff was bound to furnish cars to be sent off its line, and had adopted regulations to secure their return which were not shown to have been ineffectual, and also showing that there was an unprecedented demand for cars at the time when defendant failed to supply plaintiff's demands. (Page 197.)

Appeal from Sebastian Circuit Court, Fort Smith District; *Daniel Hon,* Judge; reversed.

### STATEMENT BY THE COURT.

The Hoffman Coal Company brought this suit against the Midland Valley Railroad Company in the Sebastian Circuit

Court for the Ft. Smith District, to recover damages for an alleged failure of the defendant to furnish cars for shipment of coal from the coal mine of the plaintiff. There was a jury trial, and a verdict for the plaintiff in the sum of $4,500. From a judgment rendered upon this verdict the defendant has duly prosecuted an appeal to this court.

The abstract of counsel for defendant, now appellant, states the substance of the pleadings, with the action of the court thereon, as follows:

"The complaint in substance alleges the following: That defendant was engaged in operating a railroad in Sebastian County, which road reached the coal field of said company, in which were located several coal mines, among them a coal mine operated by plaintiff.

"It is further alleged that the method of mining coal was to shoot down one day a sufficient amount of coal to be loaded on cars the next day, and that it was plaintiff's custom to order, at the end of each day, a sufficient number of cars in which to ship the coal that was shot down at the close of the day on which the cars were ordered; that, in pursuance of this custom, it ordered on the several days set out in the complaint cars sufficient to remove its output, which was alleged to be 250 tons, and that the defendant failed to furnish the cars as ordered. Plaintiff further alleges that the coal was to be shipped to points in Oklahoma, Indian Territory and Texas, under an agreement with the McAlester Fuel Company, with which plaintiff had an arrangement to sell its entire output, and that during the times complained of the said Fuel Company had orders for the said coal in Indian Territory, Oklahoma and Texas, and that plaintiff could and would have sold its entire output through the said Fuel Company at an average profit of seventy-five cents (75c) per ton. After alleging the number of days upon which it ordered cars and that the said cars were not furnished as ordered, the complaint further alleges that defendant failed to use due care and diligence to furnish itself with sufficient equipment to carry plaintiff's coal, and that it could have furnished the cars ordered within a reasonable time thereafter but for the negligence of defendant in not providing itself with sufficient equipment. The complaint concludes with the following allegation of damages:

'That if defendant had used due care and diligence it could have furnished itself with sufficient equipment to carry plaintiff's coal, could have furnished cars within a reasonable time after being requested; but by reason of the default of defendant to furnish cars, as hereinbefore alleged, it lost the sale of, and failed to produce, 30,500 tons of coal, which could and would have been sold at the profit aforesaid during said period, to its damage in the sum of $22,875.'

"Defendant filed petition to transfer the cause to the United States court. Petition is based upon the contention that, as the complaint shows on its face all the coal shipments for which cars were ordered were interstate shipments, plaintiff's cause of action, if any existed, arose under the provisions of the acts of Congress, and involves the construction of the acts of Congress, and especially of what is known as the Interstate Commerce Acts. The court denied the petition, and defendant excepted.

"Defendant then interposed demurrer to the complaint upon the grounds that it did not state facts sufficient to constitute a cause of action, and on its face showed the court had no juris-diction. The demurrer further challenged the sufficiency of the complaint upon grounds similar to the grounds set out in the petition to remove the cause to the United States court; the de-murrer alleging that plaintiff's cause of action, if any, arose under the acts of Congress, and that it cannot bring suit in the State court for failing to furnish cars for interstate shipments, but that complaints of this kind must be first lodged with the Inter-state Commerce Commission. The demurrer was overruled, and defendant excepted.

"Defendant then filed motion to require plaintiff to make its complaint more definite and certain. The motion asks that plain-tiff be required to state to what points in Indian Territory, Okla-homa and Texas it desired to ship the coal for which the cars were ordered, and to state for what points it ordered cars for the shipment of coal, to what points the cars were to be con-signed, and to state the orders it had for the sale of coal which it did not ship, the parties from whom the orders were received, and to set out, by itemized account and bill of particulars, its dam-age, so that said bill of particulars would show the orders it had for each day defendant failed to furnish cars, from whom the

orders were received, the quantity of coal for which given, the number of cars required, and the places to which shipments were to be made. This motion was overruled, and defendant excepted.

"Defendant then filed answer, denying specifically each and every allegation of plaintiff's complaint.

"The defendant, in the second paragraph of its answer, set up the defense that plaintiff, during the times complained of, was a member of a pool, trust and combination organized to control, regulate and fix the price of coal, and to limit the quantity of production; that the Fuel Company, through which its alleged sales were made, was also a member of the pool and combination, and that no coal was sold by plaintiff, or contracted to be sold by it, except by and through the said trust and combination; that it had no orders for coal except as a member of and through the said trust, and that it made no profit, and could not and would not have made the profit alleged by it, or any profit, except by the unlawful combination of which it was a member. To this paragraph the court sustained demurrer filed by plaintiff, and defendant reserved its exceptions."

The Hoffman Coal Company had a ten years' lease upon 120 acres of land in Sebastian County, under 110 acres of which was a seven-foot vein of coal, which would produce, according to the testimony of the plaintiff, about 7,000 tons per acre, or approximately 700,000 tons for the entire acreage. The Midland Valley Railroad Company began the construction of its line of railroad, and its road was open for traffic in that field in 1903. On the 5th day of December, 1903, the parties to this suit entered into a contract for furnishing cars to appellee for the purpose of transporting its coal.

The contract in substance provided for the building of a spur track to defendant's mine, the coal company agreeing to build a tipple, furnish right of way and the expense of laying track, the defendant to furnish the steel and other necessary appliances to lay the track, and to furnish at the tipple "such a number of cars for the shipment of the coal of the party of the second part, so that the party of the second part should be able to operate its mine not fewer hours per month than ninety (90) per cent. of the hours per month the mines are operated of any

other person or corporation on the railroad of the party of the first part, including the mines of the party of the first part." The contract further provided that all coal mined should be shipped over the defendant's road.

There was then introduced in evidence over the objection of defendant a lease for the land upon which plaintiff's mine was located, made by the Hartford Coal Company to the Hoffman Coal Company, November 1, 1904. This lease was for ten years, and provided for the payment of eight (8) cents per ton royalty on all coal mined.

The method of loading coal was to bring it from the underground workings to the tipple, and from the tipple to dump it into the railroad cars. The capacity of the mine, during September, 1906, was 250 tons of coal per day, which was increased to about 350 tons in July, 1907. The custom of ordering cars was by telephoning defendant's agent at Hartford about four o'clock in the afternoon, telling him the number of cars that would be needed next day.

Such other facts as may be necessary to a proper understanding of the issues presented for our determination will be stated in the respective parts of the opinion to which they are applicable.

*Ira D. Oglesby,* for appellant.

The complaint shows on its face that the cars ordered, and not furnished, were intended for interstate shipments of coal. The court should therefore have sustained appellant's petition to transfer the case to the United States court. 158 U. S. 98; 201 U. S. 321; 76 Ark. 82; 109 Fed. 831; 42 S. W. 354; Snyder on Interstate Com. Act, pp. 69, 237, 237; sec. 3, Interstate Com. Act. The defendant was not bound to furnish cars for shipments beyond its own line. The demurrer should therefore have been sustained. 46 Ark. 45; 71 Ark. 571; 54 Ark. 22; 74 Ark. 285; 61 Ark. 560; 122 Ill. 506; 31 Fed. 864; Hutchinson on Car., § 1367; Elliott on Railroads, § 1724. Appellee's business being illegal, it cannot complain because a carrier is not prompt in furnishing transportation. Kirby's Dig., § § 1972-1982. Appellant could not be compelled to permit its cars to go to foreign roads. Its request for a peremptory instruction should, therefore,

have been granted. 40 Mo. 491; 99 N. W. 309; 95 S. W. 170; 92 S. W. 531; 52 S. E. 677; 99 Mass. 508; 61 Ark. 650.

*Stewart & Gordon, Read & McDonough* and *F. A. Youmans,* for appellee; *C. T. Wetherby,* of counsel.

The petition for removal was not filed in time. It was therefore properly denied. 76 Ark. 362. Any shipper may in this State recover at common law the damages suffered by reason of a common carrier's failure to furnish cars. 79 Ark. 59; 76 Ark. 220; 75 Ark. 64; 77 Ark. 35. Such a suit can be maintained in the State court. 115 S. W. 107. Appellee was entitled to have its order for cars filled, although its coal had not been mined. 154 Fed. 112. A common carrier may so hold itself out to the public as to make itself liable for failure to receive and carry goods beyond its own line. 61 Ind. 577; 141 Ind. 267; 38 Ia. 601. The defense that appellee was engaged in an illegal business is not available to appellant. 86 Fed. 674; 184 U. S. 547; 68 Pac. 1086. Recovery can be had in all cases where the plaintiff in his suit is not compelled to rely upon an illegal contract. 145 U. S. 421. Failure of connecting lines to return cars is no defense. 85 Ark. 311. The measure of damages was the loss of profits. 49 Ill. 211; 26 Minn. 256; 44 Md. 268. A common carrier's first duty is to furnish itself with facilities for the transportation of such goods as he holds himself out ready to carry. Hutchinson on Car., § 292; 94 S. W. 176; 57 Pa. St. 301; 10 Interstate Com. Rep., 226. A State court has jurisdiction of a suit to recover the excess of freight charged over and above the amount allowed by the Interstate Commerce Commission upon the ground that it is a suit to recover back a wholly unjust and unauthorized exaction. 131 Ia. 405; 108 N. W. 759; 62 Fed. 24; 35 C. C. A. 62. A corporation does not become an outcast by becoming a member of a trust. 184 U. S. 541.

*Ira D. Oglesby,* in reply.

The common-law action gives no greater rights than a remedy prescribed by statute. The interstate commerce act supersedes all other remedies. 76 Ark. 83; 158 U. S. 98. A demand for cars for use in shipping coal out of the State is the initial step in an interstate transaction, and falls within the exclusive federal authority. 73 Ark. 373. A railroad company is not

bound to furnish cars to be used for an illegal purpose. The demurrer to defendant's answer should, on this account, have been overruled. 75 Ark. 181; 30 S. W. 956; 59 S. W. 709; 54 S. W. 804; 71 S. W. 691; 48 Am. St. 317; 17 *Id.* 445; 6 Wis. 468; 99 Am. Dec. 580, note; 130 U. S. 396; 155 Ill. 166; 74 Am. St. 189.

HART, J., (after stating the facts). I. Counsel for appellant first challenges the jurisdiction of the State courts. He insists that, as all the cars were to be used for interstate shipments, the court below was without jurisdiction; and that, under the Hepburn amendment to the Interstate Commerce Act, the forum in which appellee should have sought reparation was either the Interstate Commerce Commission, or the United States courts of competent jurisdiction. His chief reliance in support of his contention is based upon the decision of the Supreme Court of the United States in the case of the *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, as applied to the provisions of the Interstate Commerce Act. We do not consider that case applicable to the question now under discussion. In the Abilene Cotton Oil Company case the shipper sought reparation in the State court, and his cause of action was based upon the unreasonableness of an established freight rate. The court held that he could not maintain an action at law in such case prior to a finding by the Interstate Commerce Commission that the rates were unreasonable. In that case it was insisted by the shipper that section 22 of the act of Congress to regulate commerce, viz: "Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in adition to such remedies," gave the court jurisdiction. In reference thereto Mr. Justice White, who delivered the opinion of the court, said:

"This clause, however, cannot be construed as continuing in shippers a common-law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself. The clause is concerned alone with rights recognized in or duties imposed by the act, and the manifest purpose of the provision in question was to make plain the intention that any specific remedy given by the act should be regarded as cumulative, when other

appropriate - common-law or statutory remedies existed for the redress of the particular grievance or wrong dealt with in the act."

The court held that the shipper must seek redress primarily through the Interstate Commerce Commission, where the unreasonableness of an established freight rate was involved, because in that way only could uniformity of rates be preserved. That was the sole ground of the decision, as is emphasized by the later decision of the *Southern Ry. Co.* v. *Tift*, 206 U. S. 428, where it was held that, after a freight rate has been found, upon testimony, by the commission to be unreasonable, the testimony and finding of the commission may be made the basis of a decree in a United States circuit court, sitting in equity, enjoining the carrier from enforcing such unreasonable rate.

In the case of *Danciger* v. *Wells Fargo & Co.*, 154 Fed. 379, which was a suit by a shipper against a carrier to require it to receive and transport property tendered for shipment, the court held it to be one to compel the performance of a duty imposed on it by law, and to be within the jurisdiction of the courts. In disposing of the question the court used this language:

"A further contention made by the defendant is that the court of exclusive original jurisdiction in this controversy is the Interstate Commerce Commission, and that this court has no jurisdiction in the first instance to afford to complainants the relief here sought; and much reliance is placed by the defendants on the case of *Texas & Pac. Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553. From a reading of that case, I do not consider it applicable to the state of facts here presented. If the controversy here was as to whether the defendants were charging excessive or unreasonable rates for the shipments tendered by complainants, the case relied upon would to my mind be in point; but as the ground of relief sought by complainants in the case at bar is the performance by defendants of a duty imposed upon them by law, which they wholly neglect and refuse to perform, I think such question is one for the determination of the courts."

In the case of *Chicago, R. I. & P. Ry. Co.* v. *Clements*, (Tex. Civ. App.) 115 S. W. 664, the court held: "The liability of connecting carriers for breach of their common-law or con-

tractual duty in respect to property received for shipment is not regulated or affected by the interstate commerce act, though the shipment is an interstate one, and therefore an action against them for injuries to the property caused by negligence and delay in transportation, being based on a breach of such duty, and not on any infraction of said act, is properly brought in a State court."

This, too, is the construction placed upon the act by the Interstate Commerce Commission.  In the case of *Richmond Elevator Co.* v. *Pere Marquette Rd. Co.,* 10 I. C. R. 636, it is said: "The act to regulate commerce contains no provision which expressly or by proper implication gives this commission jurisdiction in cases merely showing delay or negligence in the receipt, forwarding or delivery of property offered for transportation, and this necessarily includes failure on the part of the carrier to furnish cars for the movement of freight within a reasonable time." To the same effect see *Smeltzer* v. *St. L. & S. F. Rd. Co.,* 158 Fed. 649, by Rogers, Dist. Judge; *Southern Pac. Co.* v. *Crenshaw Bros.* (Ga. App.), 63 S. E. 865, by Mr. Justice Powell.

The case now under consideration involves the liability of the carrier to the shipper for an alleged breach of its common-law or contractual duty for its failure to furnish cars, and does not involve any infraction of the provisions of the interstate commerce act; and we are of the opinion that the suit was properly brought in the State court.  This view, we think, is the logical result to be deduced from the reasoning of the authorities cited *supra,* and from the opinion of this court in the case of *Halliday Milling Co.* v. *La. & N. W. Rd. Co.,* 80 Ark. 536.  Hence the court properly overruled the demurrer to the jurisdiction of the court.

II.   Counsel for appellant urges that the court below erred in not sustaining appellant's motion to transfer the cause to the United States court for the Western District of Arkansas.  Assuming that the case was removable, the petition was not filed in time.  "A petition for removal of a cause to a Federal court which is filed after the time allowed by the statutes of this State for filing of answers to complaints is too late."  *Kansas City So. Ry. Co.* v. *McGinty,* 76 Ark. 356, and cases cited.

The time to file a petition for removal is not extended by an

extension of the time to answer.  Moon on Removal of Causes, § 156 and cases cited.  In the case of *Ruby Canyon Gold Min. Co.* v. *Hunter,* 60 Fed. 305, the court said that the act of Congress is imperative, and requires the petition to be filed within the time fixed by the statute (where the statute fixes it), or within the time fixed by the rule of court (where the rule of court fixes it), and not within any time that a defendant may obtain by stipulation with the plaintiff, or by order of court."

It follows then that, the petition for removal not having been filed within the time fixed by statute for filing answer, the court was right in denying it.

III.   Appellant alleged in one paragraph of its answer that appellee associated itself with others in forming a pool or trust for the sale of coal, and that it sold all its coal through the Mc-Alester Fuel Company, which was a member of the pool or trust, and that such agreement was an illegal combination in violation of the statutes of the State of Arkansas and of the United States. Appellant further alleged that all the profits that appellee made or could have made, had appellant furnished it cars, were made on account of it being a member of the pool or trust to regulate and control the price of coal.

Appellee filed a motion to strike out that paragraph of appellant's answer, which motion was sustained by the court.  Counsel for appellant predicates error in the action of the court in that regard.  To sustain his contention, counsel has cited the case of *Continental Wall Paper Co.* v. *Voight & Sons Company,* 212 U. S. 227, 29 S. C. Rep. 280.  In that case the court held (quoting headnotes) :

"1.   A recovery upon an account for goods sold and delivered by a corporation created to effectuate a combination of wall paper manufacturers, intended and having the effect directly to restrain and monopolize trade and commerce, in violation of the anti-trust act of July 2, 1890 (26 Stat, at L. 209, chap. 647, U. S. Comp. Stat. 1901, p. 3200), cannot be had where the account is made up, within the knowledge of both buyer and seller, with direct reference to, and in execution of, the agreements which constitute the illegal combination.

"2.   Defendants in an action for goods sold and delivered are entitled to judgment on a demurrer admitting the allega-

tions of a defense set up by the answer, which in substance disclose that plaintiff is the selling agent of a combination of wall paper manufacturers which offends against the anti-trust. act of July 2, 1890; that, in carrying out such combination, defendants were virtually compelled to sign a jobber's agreement, which, in effect, bound them to buy from the plaintiff all the wall paper needed in their business at certain fixed prices, and not to sell at lower prices or upon better terms than those at which plaintiff itself sells to dealers other than jobbers; that the goods in question were ordered pursuant to such agreement and at the prices fixed; that such prices were unreasonable; and that all the transactions between the parties were in furtherance of the illegal combination."

The grounds of the decision in that case are based upon a state of facts essentially different from those presented by the record in the present case. There both parties to the suit were parties to the illegal agreement, and it was held that the courts will refuse to render any assistance in carrying out an illegal agreement on the ground of public policy; and that in no other way could the public be protected. In the instant case appellant was not a member of the pool, and the contract made by it with appellee, an alleged member of the pool, was collateral to the unlawful combination, and not tainted thereby. Neither the common law nor contractual duty of appellant to furnish cars was in any way connected with the illegal combination, and they are therefore unaffected thereby. The rule is that an otherwise legal contract is not affected by another collateral contract, which might be illegal. This distinction is made plain by the decision in the case of *Chicago Wall Paper Mills* v. *General Paper Co.*, 147 Fed. 491. The facts in that case were that a number of wall paper companies combined together to arbitrarily fix the prices of wall paper and to control the sale of the same. The General Paper Company was a member of the combination, and became the exclusive sales agent of the other members, with the exclusive power to determine the extent of the output, and to arbitrarily fix the prices. It sold a large quantity of wall paper to the Chicago Wall Paper Company, and, not being able to obtain payment, brought suit to recover the purchase price of the goods. The same defense was interposed in that case as in the present one. The court held

that "a contract for the sale of merchandise is not rendered illegal by the fact that the selling corporation is a trust or monopoly organized in violation of law, either Federal or State, the contract of sale being collateral and having no direct relation to the unlawful scheme or combination."

This distinction was also recognized in the case of *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, the court holding that "a violation of the Sherman Anti-Trust Act of July 2, 1890, by the formationn of a combination in restraint of trade, by which a penalty is incurred under the statute, does not preclude the company thus illegally formed from recovering on collateral contracts for the purchase price of goods."

IV. On the measure of damages the court gave the following instruction: "6. If you find for the plaintiff under the instructions given you in this case, then you are to determine what damage, if any, it has suffered by reason of the failure of the defendant company to furnish cars for the disposition of its coal. If you find plaintiff could and would have sold its coal from its mines at a profit to itself, and was prevented by the wrongful act of the defendant from making such sale and earning such profits, then the defendant must compensate it in damages for the amount of the profit or gain which this prevented it from making. In arriving at such amount, you should consider the nature of its business, the condition of the coal, the kind of coal that it produced, the quantity of coal that it produced, its opportunity for selling and the market price at which it could have sold; and the price or prices at which the coal produced by it should and would have been sold, less the cost of producing and marketing such coal, including the royalties to be paid thereon, would be the measure of its recovery. And in this connection I charge you that the cost of production above referred to must be measured and computed on the bases of a reasonable car supply."

Counsel for appellant assigns as error the action of the court in giving this instruction. The general principles applicable to the subject are stated in the case of *Central Coal & Coke Co.* v. *Hartman*, 49 C. C. A. 244, as follows:

"Now, the anticipated profits of a business are generally so dependent upon numerous and uncertain contingencies that their

amount is not susceptible of proof with any reasonable degree of certainty; hence the general rule that the expected profits of a commercial business are too remote, speculative and uncertain to warrant a judgment for their loss (citing cases). There is a notable exception to this general rule. It is that the loss of profits from the destruction or interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his loss actually was. The reason for this exception is that the owner of a long-established business generally has it in his power to prove the amount of capital he has invested, the market rate of interest thereon, the amount of the monthly and yearly expenses of operating his business, and the monthly and yearly income he derives from it for a long time before and for the time during the interruption of which he complains. * * * One, however, who would avail himself of this exception to the general rule must bring his proof within the reason which warrants the exception. He who is prevented from embarking in a new business can recover no profits because there are no provable data of past business from which the fact that anticipated profits would have been realized can be legally deduced."

In the case of *Baxley* v. *Tallassee & M. R. Co.* (Ala.) 29 So. 451, in discussing the measure of damages in an action by a shipper against a carrier for breach of contract to furnish cars, the court recognized this exception to the general rule, and said: "The special circumstances which we have hypothesized, taken in connection with notice to defendant of them, take the case out of the general rule of damages obtaining in cases of failure by common carrier to carry and deliver, and bring it within the special rule formulated above, on the theory that such damages were within contemplation of the parties."

The exception to the general rule was recognized and applied by this court in the case of *Border City Ice & Coal Co.* v. *Adams,* 69 Ark. 219. See also *Goebel* v. *Hough,* 26 Minn. 252.

In the case of *Atlantic Coast Line R. Co.* v. *Geraty,* 166 Fed. 10, the court held (syllabus): "Where a carrier, having facilities for furnishing shippers of vegetables refrigerator cars in which to transport the same, which cars the carrier did not own as a part of its equipment, had led the plaintiff and other

vegetable growers in the region to expect that, if they raised vegetables, refrigerator cars necessary for their transportation would be obtainable, plaintiff was entitled to recover damages sustained by the carrier's refusal to furnish refrigerator cars for the transportation of plaintiff's cabbages on reasonable demand."

In the case under consideration appellee had an established business, and had been encouraged by appellant to open its mine. Appellant had entered into an agreement to furnish cars to appellee, and bound appellee not to enter into a contract with another line of railway for shipment of its coal. Appellant knew that certain fixed charges had to be met, whether the mine ran or was idle. It knew that the only practical way to mine the coal was, at the close of each day's work, to "shoot down" and separate from the main bed of coal a sufficient amount of coal to keep the employees busy throughout the succeeding day, loading it on the mining cars to be hoisted to the tipple and there be emptied into the railroad cars; that it is not practical to store the coal, but that the mining and transportation must be carried on together.

Tested by the principles announced above, in connection with the special circumstances adduced in evidence and the notice appellant had of these circumstances, we are of the opinion that the net profits of operating the mine as damages for a breach of the contract may fairly be said to have been in contemplation of the parties when the contract for furnishing cars for the shipment of appellee's coal was entered into.

V. Appellee, in making its case, was allowed to introduce evidence to the effect that there was no congestion of traffic on the line of appellant or connecting carriers during the time for which appellant is charged with failure to furnish cars, and that during such period the car service on such connecting lines was good. One of the defenses interposed by appellant was that during such period there was an unprecedented demand for cars, and it adduced evidence tending to show that there was a congestion of traffic on all the connecting lines of appellant. Appellee should not have anticipated its defense, but should have presented testimony in rebuttal to contradict that of appellant. The order of the introduction of the testimony, however, was a matter

in the discretion of the court, and we cannot say that the action of the court was prejudicial to the rights of appellant. *Butler* v. *State*, 83 Ark. 272.

VI. Objection is also made to the admission of testimony on the part of appellee with reference to the effect the failure to furnish cars would have upon the mine as to expense of maintenance and also as to the cost of mining the coal. This evidence was admissible in arriving at the net profits.

Objection was also made to the introduction of certain letters of the officials of the railroad. These letters were competent in so far as they tended to show that the officers of the railroad knew that appellant did not have sufficient cars to meet the ordinary demands of the shippers.

VII. The court gave the following instructions: "4. You are further instructed that the fact that connecting lines have failed and refused to return promptly the cars of the defendant is no valid legal excuse or defense in this case absolving the defendant from its obligation to furnish with reasonable promptness and diligence sufficient cars for the transportation of plaintiff's coal."

"5. You are instructed that, in order for the Midland Valley Railroad Company to avail itself of a defense that it could not furnish plaintiff cars because there was a great congestion of traffic, it must appear to your mind by a preponderance of evidence that there was such an unprecedented and extraordinary amount of freight offered for transportation as that it could not have been reasonably anticipated by the defendant company. And you are further instructed in this connection that it is the duty of the defendant company to keep in touch with natural conditions and with the usual natural developments of the country."

Counsel assigns as error the action of the court in giving the fourth instruction just quoted. A majority of the judges think that under the rule announced in the case of *St. Louis S. W. Ry. Co.* v. *State*, 85 Ark. 311, and in *St. Louis S. W. Ry. Co.* v. *Phoenix Cotton Oil Co.*, 88 Ark. 594, the giving of this instruction was error. A supplemental opinion on this point has been written by Chief Justice McCULLOCH. The writer of this opinion thinks no prejudice resulted from the giving of that instruction. The court in its fifth instruction, just quoted, cor-

rectly instructed the jury on appellant's defense of there being an unprecedented demand for cars. Appellant by its own contract agreed to send its cars off its own line. In the case of *St. Louis S. W. Ry. Co.* v. *State, supra,* the court said: "Until appellant carrier shows reasonable rules and regulations for the interchange of cars, it can not avail itself of those rules of interchange as causing and excusing its default to the public, for the rules here shown have proved unreasonable and inefficient before this default occurred."

So, in the present case the writer thinks that the uncontradicted testimony showed that the rules and regulations had proved inefficient for the purpose for which they were designed before the default herein complained of occurred.

Other assignments of error are urged upon us; but, inasmuch as we have reversed the case for the error already indicated, we have deemed it proper to pass upon only such other assignments of error as seem to us from the present state of the record will necessarily arise on a new trial of the case.

As the majority of the judges are of the opinion that the giving of the fourth instruction above quoted was prejudicial to appellant, the judgment is reversed and the cause remanded.

McCULLOCH, C. J., (concurring). The basis of the plaintiff's claim for damages in this case is the alleged fact that defendant induced it to open up and operate coal mines under a promise to furnish sufficient transportation facilities, thus supplementing the duty imposed by law upon the railroad company to furnish such facilities and to properly equip itself for that purpose. A failure to furnish cars in performance of that promise and of such legal duty is charged. The evidence shows that there is a market on defendant's line of road for only a small percentage of coal mined thereon, and that the greater percentage of coal shipments go off the line. Therefore, most of the cars required for shipment of coal were to go off the line. This was necessarily in contemplation of the parties, and forms a basis of plaintiff's case that it and the other coal operators were to be furnished cars to be sent off defendant's line. Yet the court, by giving instruction number four at plaintiff's request, refused to allow the jury to consider the fact that cars were off the line, which defendant by the most diligent effort could not regain, in

determining whether or not the defendant was excusable for failure to furnish all the cars demanded. The effect of this instruction was to tell the jury that the failure to get back cars sent off the line could not under any circumstances justify a failure to furnish all cars demanded by shippers. The manifest injustice of giving this instruction (number four) is seen when it is read in connection with the one which precedes it. One tells the jury that defendant was bound to furnish cars to be sent off its line, and the other that the failure to get the cars back afforded no excuse for failing to furnish all cars demanded. They ground the defendant between the upper and nether mill-stones, requiring it to furnish cars to be sent off the line but not allowing it excuse, under any circumstances, for failure to get them back.

These instructions are as follows:

"3. You are instructed that if the proof shows that the defendant, the Midland Valley Railroad Company, induced persons to open coal mines along its line of road, and further induced such persons, including this plaintiff, to enter into contract by which the defendant was to have the exclusive tonnage arising from said mine, and you further believe that in the contract with plaintiff it was provided that it should not ship its coal by another line than the Midland Valley Railroad, and if he did so they should pay a penalty, and if you further believe that only a small percentage of the coal mined on the line of the Midland Valley Railroad should be along such lines, that the defendant knew this, and if you further believe that plaintiff's coal was of such character that it could not be unloaded at the terminus of defendant's line to be taken by a connecting line without serious deterioration in quality and value, then the Midland Valley Railroad Company could not put an embargo on its cars as to this plaintiff, and prevent them from going beyond its own line and upon connecting lines of railway."

"4. You are further instructed that the fact that connecting lines have failed and refused to return promptly the cars of the defendant is no valid legal excuse or defense in this case absolving the defendant from its obligation to furnish with rea-

sonable promptness and diligence sufficient cars for the transportation of plaintiff's coal."

There was testimony tending to show that during the coal shipping season of 1906-1907 (within which time the alleged damages in this case accrued) there was an unprecedented and extraordinary demand for cars for shipment of coal and other commodities, and that the same could not reasonably have been anticipated by the officials of the railroad company; that when the car shortage began the officials of defendant company not only ordered a large number of cars from car builders, but made diligent effort to regain the cars which had been sent off the line from time to time. These officials testified concerning the rules of the American Railway Association, which prescribed a penalty of 50 cents per day for failure to return cars, and also testified that, by interviewing and corresponding with officials, superintendents and traffic managers of other roads, they made persistent efforts to get the cars back, but that on account of the congested condition of traffic they were met with promises which were not fulfilled. They testified that the penalty prescribed by the rules of the Railway Association was ineffectual to cause the return of cars during this time, but how long this penalty had proved ineffectual is not disclosed by the testimony.

This testimony entitled the defendant to have the jury consider, along with other facts and circumstances in the case, the fact that cars were off the line, and that return thereof could not be secured, in determining whether or not the defendant was excusable for its failure to furnish cars to plaintiff at the times complained of.

The fact that cars off the line could not be regained would not under all circumstances afford excuse for not securing others to be furnished to shippers when demanded. Cars wholly beyond the control of a carrier are the same as if not owned at all, and their places should be supplied with others except when the conditions are only temporary and a return to normal conditions may soon be reasonably expected. A railroad company is required to anticipate and provide only for normal conditions of traffic unless it has reasons to anticipate others; and during a temporarily abnormal condition of traffic it would certainly be unjust to a company to require it to furnish a new car for every

one sent off the line in fulfillment of a contract previously made with shippers, even though it had made and was then making every reasonable effort to secure the return of its cars. We find nothing in the case of *St. Louis S. W. Ry. Co.* v. *State*, 85 Ark. 311, which conflicts with the views here expressed. That was a case where the railway company was sued to recover a statutory penalty for failing to furnish cars for intrastate shipments. The finding of the Railroad Commission made out a *prima facie* case against the company for failing to furnish cars, and it attempted to justify the failure by showing that it owned enough cars to supply the demands of its shippers if connecting lines would return its cars, but that its cars had not been returned by connecting carriers. There was a jury trial, and verdict against the railway company. The trial court submitted the case to the jury on unobjectionable instructions as to this question; but the company insisted here that the evidence adduced, which was undisputed, established the fact that on account of the failure of connecting carriers to return cars its stock was depleted, and that this excused it for the failure to furnish cars on the occasion complained of. The evidence showed that the penalty fixed by the rules of the American Railway Association for failing to return cars was ineffectual, and would not accomplish its purpose, and that this had been demonstrated for two or three years prior to the time in question. This court held that the railway company had the choice either to send cars off its line under regulations sufficient to cause a reasonably prompt return or not to send them at all, and that when it acquiesced in a regulation which had been proved to be ineffectual to cause return of cars, it could not set up, as an excuse for failure to provide equipment to shippers, the fact that its cars were on the lines of other carriers.

The difference between the two cases is that in one the railroad had the choice of keeping its cars on its own line unless a better regulation was agreed upon to cause the return of the cars, and in the other the railroad was bound by its contract with coal shippers to furnish cars to be sent off its line; and in one case the undisputed proof showed that the regulation for return of cars had broken down or proved ineffectual for several years,

and in the other case there is no proof when the regulation became ineffectual.

We conclude that in the present case the court erred in giving the fourth instruction requested by plaintiff. All concur in the opinion of Mr. Justice HART on other points, and all concur in this additional opinion except him.