CUMBIE *v.* ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY
COMPANY.

Opinion delivered November 4, 1912.

1. CARRIERS—CARRIAGE OF FREIGHT—FACILITIES FOR TRANSPORTATION.—The statute requiring carriers to furnish without discrimination or delay sufficient facilities for the transportation of freight is not intended to impose an absolute duty, but is declaratory merely of the

common law, and does not require the carrier to provide in advance for any unprecedented and unexpected rush of business. (Page 418.)

2.    SAME—CARRIAGE OF FREIGHT—CONTRACT.—Where a carrier expressly contracted to transport the peach crop of a certain locality, on its failure to do so it can not defend on the ground that it was prevented from doing so by heavy and unprecedented traffic or other unavoidable casualties, but the contract does not relieve the shipper from ordering the cars for a specified time and place as required by law. (Page 419.)

3.    SAME—CONTRACT TO FURNISH CARS—MUTUALITY.—A shipper's order, calling for a specified number of cars for a specified day, when accepted by a common carrier, constitutes a contract binding the carrier to furnish the cars and the shipper to furnish the goods to load the cars, but such contract does not render the carrier liable for failure to furnish cars to parties who did not authorize the order, but who would have used the cars if they had arrived. (Page 420.)

Appeal from Sebastian Circuit Court, Greenwood District; *Daniel Hon,* Judge; affirmed.

### STATEMENT BY THE COURT.

Appellants instituted separate suits against appellee to recover damages for appellee failing to furnish them cars for the shipment of peaches. These cases were consolidated and tried together in the court below. The same judgment was rendered in each case, and the issues involved in the appeal are the same.

The evidence adduced by appellants tends to prove substantially the following state of facts:

Quite a number of people were engaged in the business of growing peaches for sale and shipment, and some of them organized themselves into what they called a "Fruit Growers' Association." Mr. C. E. Carstarphen was the agent of appellee railway company to solicit shipments of freight over its line of railroad. In the spring of 1907 he went to Greenwood for the purpose of soliciting in advance the shipment of peaches over appellee's line of railroad. He talked with Mr. R. C. Cumbie, and others in regard to the matter. He asked them what they wanted, and Mr. Cumbie told him they wanted a shed. Carstarphen said that it was too late to build a shed for that season, and, if it would suit the peach growers as well, the railroad company would keep iced cars there for the surplus left over, and it would be much better than a shed;

that at that late day he would rather do that than to undertake to build a shed, and it was agreed that he was to do that. R. C. Cumbie estimated that from between seventy-five and one hundred cars of peaches would be shipped from Greenwood, Arkansas. Carstarphen agreed to keep cars there at all times for the peaches to be loaded in. He said that the shippers could load the peaches direct from the wagon into the iced cars.

When the season arrived for the shipment of the peaches, R. C. Cumbie said: "The understanding was that I was to order cars orally. We agreed that it would be unnecessary to order cars by making a written order because I was the agent and was supposed to be right there on the ground with the railroad agent; that is the plan we hit on and the plan we worked on and the plan we ordered on. The understanding over there was that I was to make the order by 5 o'clock in the evening so as to be sure we would get the cars." We further quote from his testimony as follows:

"Q. Then when would the cars be expected? A. We would be expecting them, if he ordered for the next morning at 10 o'clock, that is if they could get them here; they agreed to get them there if they could on the 10 o'clock train the next morning; if not by 5 o'clock the next evening; get some cars for the next morning by 10 o'clock ordering them at 5 o'clock this evening. Q. That is the understanding that they would bring part of the cars on the 10 o'clock train that you ordered for 5? A. Or bring them out on the evening train; would make the order for 10 o'clock, and they would get them if they could; if not, they would get them on the evening train at 5 o'clock. Q. If you made the order for the 10 o'clock train, they would bring them on the 10? A. Yes, they did not always do it. Q. It was the understanding they would? A. Yes, sir. Q. But didn't always do it? A. No, sir. Q. You made the order for the evening train, it was the understanding they would get them that way? A. Yes, but they did not always do that. Q. I will ask you if the orders had come out as you made them, whether you made them in time for them to have had cars there for the peaches if they had filled your orders? A. I think practically so; of course anybody might make a mistake and order a car too many or

might lack having enough, because you don't know this evening at 5 o'clock how many wagon loads come in, but we tried to ascertain those things about how many were gathered and about how many wagon loads came in, and tried to make an estimate at 5 o'clock about how many cars would be needed the next day and order that amount; I think if he had got the cars we ordered, we would have had plenty of cars. Q. To have loaded them right off the wagons without having to stack them out there? A. Yes, sir. Q. Or on sheds or platforms. How long after the shipping season was it until they failed to fill your orders for cars? A. I am not sure, but my impression is that the first failure they made was about either Saturday or Sunday, and we began the first of the week, perhaps about the first of the week; I do not think it was more than three or four days. Q. I will ask you if at the time the peaches there in controversy—were left there on the shed, being no cars for them—I will ask you if you did not order plenty of cars then if they had filled your orders to have taken the peaches? A. Yes, I ordered cars every day—that is right at the very beginning—I do not know whether I ordered cars the first day or began the next day, I think I did, but at one time might be a few peaches scattered around there and might need car today and would not need one a day or two— during the active part of the season I did."

The testimony on the part of the appellants tended to show that their peaches rotted because of the fact of appellee failing to furnish them cars in which to ship them.

The testimony on the part of the railway company tended to show that when the time arrived to ship the peaches the matter of ordering cars was left to the railroad company's agent at Greenwood, and that his judgment as to the number of cars necessary from day to day was to be controlling.

Other facts will be stated or referred to in the opinion.

There was a verdict in favor of the railway company, and the cases are here on appeal.

*Rowe & Rowe* and *R. A. Rowe,* for appellants.

*Thos B. Pryor,* for appellee.

HART, J., (after stating the facts). Counsel for appellants first insist that the effect of the agreement made with

Mr. Carstarphen, as detailed in the statement of facts, obviated the necessity of them ordering cars for the shipment of their peaches, and that it was the duty of the railway company to have the cars there at all times for the shipment of peaches, whether ordered by appellants or not.   We do not agree with them in this contention.   We have held that our statute requiring carriers to furnish, without discrimination or delay, sufficient facilities for the carriage of freight is not intended to make the duty of carriers to furnish transportation facilities an absolute one, but is simply declaratory of one of the requirements of the common law, and therefore does not require the carrier to provide in advance for any unprecedented and unexpected rush of business.   *St. Louis S. W. Ry. Co.* v. *Clay County Gin Co.*, 77 Ark. 357.

In the case of *Mauldin* v. *Seaboard Air Line Ry. Co.*, 73 S. C. 9, 52 S. E. 677, it is held that the difference between the obligation to furnish cars imposed by law and that imposed by a contract to furnish them is that the contractual obligation is more onerous; for, while a railroad is not liable for nonperformance of its legal obligations where it has a reasonable excuse to furnish cars as such heavy and unprecedented traffic, it is not relieved from the obligation to perform its contracts by unexpected emergencies in its business.

In 4 Elliott on Railroads, (2 ed.), § 1473, the author states the difference as follows:   "Where a railroad company expressly undertakes by special contract to furnish cars at a specified time, it is bound to perform its contract.   Where there is no express contract, then, as we have seen, an unusual press of business may excuse the company for a failure to furnish cars; but where there is an express contract, the rule is that a press of business, although unusual and unexpected, will not relieve the company from liability.   Where there is an express contract, of the character above indicated, to furnish cars at a specified time, the fact that an unavoidable accident prevents the company from performing its contract will not exonerate it from liability to a shipper who suffers an injury because of the failure to perform the contract."   See also *Midland Valley R. Co.* v. *Hoffman Coal Co.*, 91 Ark. 180.

In view of these principles, we think the effect of the contract, as stated in the statement of facts, was to preclude

the railroad company from interposing as a defense for failing to furnish cars that it was prevented from doing so by heavy and unprecedented traffic or other unavoidable casualties, and that the contract did not relieve the shipper of the obligation of ordering cars for a specified time and place as required by law.

It is next contended by counsel for appellants that when the time for the shipment of the peaches was at hand R. C. Cumbie made an agreement for himself and all others who intended to ship peaches from the locality that he was to order cars orally; that if the order was made on one afternoon the cars were to be sent out on the first train the next morning, or in default of that on the afternoon train. Such a contract would be void for want of mutuality as to all parties except Cumbie and those who had authorized him to make such contract for them. It is well settled that a shipper's order calling for a specified number of cars for a specified day when accepted by a common carrier constitutes a contract binding the carrier to furnish the cars and the shipper to furnish the goods wherewith to load the cars. 2 Hutchinson on Carriers, (3 ed.), § 495; *Railway Co.* v. *Bundy*, 97 Ill. App. 202.

In the present cases there is no testimony that appellants authorized R. C. Cumbie to make such a contract for them. Let us suppose that Cumbie had ordered a given number of cars for a designated day and the railroad had furnished them in compliance with the order. Can it be said that the railroad company would have had an action against these appellants if a sufficient number of peaches had not been placed in the cars for shipment to fill them? There can be no doubt but that this question must be answered in the negative. A request to a carrier for cars carries with it by implication of law an agreement to make use of the cars if the request is complied with and a correlative promise to pay the railroad company whatever loss might be incurred by it in the event the cars were not used. The contract must be sufficiently definite to bind the carrier to furnish the cars and the shipper to use the cars when furnished. Under the facts of these cases, as detailed by appellants, if cars ordered by R. C. Cumbie had been furnished by the railroad company and had not been used, the railroad company would have had a cause of action against R. C.

Cumbie, but none against these appellants, because they did not authorize him to order cars for them, and the jury could not have inferred a promise by them to do something which they had not agreed to do.

Indeed, all of the appellants except N. G. Cumbie expressly stated that they did not order any cars on the day in question, nor authorize any one else to order cars for them. They had brought their peaches to the town of Greenwood, and, failing to find a local market for them, then carried them to the depot, and offered them for shipment.

Therefore, the judgment will be affirmed.